In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3086

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANWAR HADDAD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 772—**Robert W. Gettleman**, *Judge.*

ARGUED JUNE 5, 2006—DECIDED SEPTEMBER 14, 2006

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.*   A jury found Anwar Haddad was guilty of one count of wire fraud and two counts of money laundering, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1957. Haddad's store, R & F Grocery ("R&F"), was authorized to sell certain approved food items for food stamps. The evidence showed that he defrauded the United States Department of Agriculture ("USDA") by exchanging food stamps for cash, keeping a cut of the transactions for himself.

Haddad was sentenced to concurrent terms of 51 months' imprisonment on all three counts and two years of supervised release. The district court ordered him to pay

$801,067.37 in restitution. Haddad appeals, arguing that the district court erred when it denied his request to give an entrapment instruction to the jury. He further contends that the evidence was insufficient to support a conviction under 18 U.S.C. § 1957. Haddad adds that the district court erred in its supplemental jury instruction for 18 U.S.C. § 1957. Finally, he appeals the district court's loss amount determination. We affirm the judgment of the district court.

## I. Background

In August of 1999, Haddad became a part owner in R&F, a small, "mom and pop" business. In January of 2000 he became the full owner. As part of the USDA's Food Stamp Program, R&F was an authorized vendor to sell food to recipients of food stamp benefits. Food stamp benefits are distributed to low-income families to help them buy certain staple food items. Rather than using paper food stamps, in recent years the benefits have been provided through an electronic transfer card (known as a LINK card in Illinois) that operates like a debit card. Qualified families receive benefits once a month, with the benefit amount automatically transferred to a recipient's LINK card around the first of the month. The Food Stamp Program provides authorized vendors with specialized, point-of-sale machines that deduct money from the LINK card when food is purchased. Once the recipient's identity is confirmed by entering his or her unique PIN number, the machine checks the balance on the card and then authorizes or denies the sale via a message on the point-of-sale machine. The food stamp sales are totaled up in the machine at the end of each day. The Food Stamp Program then reimburses the store the following day through an electronic deposit of funds that transfers directly into the store's designated business bank account.

The application process for the Food Stamp Program is fairly rigorous, and requires vendors to submit supporting documentation and appear at the Food and Nutrition Service (a division of the USDA) for training. During the training sessions, a program specialist describes the rules and regulations of the Food Stamp Program, noting in detail which items can and cannot be sold for food stamp benefits. Applicants are specifically told that they cannot sell ineligible items or exchange cash for food stamp benefits, and that doing so could result in a permanent disqualification from the program as well as criminal prosecution. After the training, applicants must appear for an interview with a program specialist. At the interview, the program specialist reviews the application with the applicant and ensures that the applicant understands the Food Stamp Program's rules and regulations. At the close of the interview, the applicant signs two forms. The first form, the "Retailer Training Acknowledgment", states that the applicant understands the rules and regulations of the program, including the prohibition against exchanging food stamps for cash. The second form acknowledges that the applicant was trained on the point-of-sale machine and the applicant agrees not to use it to process food stamps for cash.

On behalf of R&F Grocery, Haddad filed an application in 1999 to continue R&F's previous participation in the Food Stamp Program with co-owner A. Saman. Haddad signed the application himself and indicated in the application that the gross sales for 1998 had been $192,868 and the eligible retail food sales during that year had been $127,938.

In the summer of 2002, the Chicago Police Department ("CPD") alerted the United States Postal Inspection Service ("USPIS") and the USDA to suspected food stamp fraud at R&F. The CPD reported that large numbers of people were gathering outside R&F around midnight on the first of each month. The agencies reviewed R&F's food stamp redemp-

tions since 2000 and noticed an unusually high volume of redemptions. As a result, the USPIS and the USDA initiated a full investigation into R&F's practices.

The USDA compiled a comprehensive list of R&F's food stamp redemptions beginning on February 1, 2000. R&F's monthly food stamp redemptions steadily increased from February of 2000, when the monthly redemption was $13,587.81, until July of 2002, when R&F redeemed $63,587.81 in food stamp benefits. In the first five days of August 2002 alone, R&F redeemed $22,269.24. Redemptions for the entire 30-month period of the scheme to defraud totaled $1,117,325.15. Essentially, R&F's sales went from an average of $10,661.50 per month in 1998 to an average of $37,244.17 per month for the 30-month period charged in the indictment.

A significant part of the investigation occurred on the days surrounding August 1, 2002. Detective William Lesko of the CPD's Financial Crimes Unit videotaped the activity immediately outside R&F from 11:30 p.m. on July 31, 2002 until 2:30 a.m. on August 1, 2002. The videotape showed customers lining up outside of the store prior to midnight on August 1. Shortly before midnight, an individual exited the store and motioned for the crowd to move over to one side. The crowd grew around midnight, with the parking lot so full of people that the crowd spilled out into the street. When customers left the store, hardly anyone carried bags of food even though R&F's records show an average of $49.99 per transaction in food stamp charges for the two-hour period.

At trial, CPD Sergeant Stanley Snarkis testified that he and two other officers went to R&F after midnight on August 1, 2002, and observed 75 to 100 people in the parking lot. The officers tried to get in the store around 1:45 a.m. but had a hard time because 15 to 20 people were "jam packed" into a small vestibule in the store. Sergeant

Snarkis observed two lines of people, one to the cash register and a second line off to one side. He identified Haddad as the individual operating the cash register.

Later in the day, around 9:40 p.m., a confidential informant ("CI") went into R&F and exchanged food stamp benefits for cash with Haddad. Prior to the exchange, USPIS inspector Lee Jones equipped the CI with a concealed recording device and gave her a LINK card with $366 worth of food stamp benefits. Jones monitored the transaction. When the CI returned, she handed Jones the recording device, the LINK card, and $180 cash along with eight LINK transaction receipts. The receipts showed that R&F charged $366.64 on the LINK card. The CI did not purchase any food.

The recorded conversation between Haddad and the CI was played at trial. The CI asked Haddad if she could "do [her] LINK." Haddad told her, "not right now." She asked if she could come back tomorrow because she needed money. He asked where her man was, and she told Haddad that he was in jail. The CI also told him that she had a three-year-old child. Haddad asked her what kind of work she did and the CI said "I hustle." Haddad said, "come on in, dear, I'm, I'm going to help you today." He asked her, "How much you gonna do?" and she replied, "All of it." Haddad then charged $366.64 to her card and provided her with $180 in cash.

Also on August 1, 2002, USPIS agents went to R&F to identify the employees working at the store and to determine if they understood the Food Stamp Program rules. Haddad was working behind the counter. Inspector Alvin Dvorak asked Haddad if he would complete a USDA questionnaire with him regarding the Food Stamp Program. During the interview Dvorak asked the questions in English and noted Haddad's answers on the form because Haddad said he could not read or write in English. Inspector Dvorak rephrased questions if Haddad indicated that he did not understand them.

On August 5, 2002, federal agents from the USDA and the USPIS arrested Haddad outside of R&F. Other agents effected a search warrant for the R&F premises and seized invoices and business documents in the store. Haddad was then taken to USPIS headquarters for processing and questioning.

Haddad gave a statement admitting that he had been trafficking in food stamps using the point-of-sale machine at R&F foods. He stated that his employees exchanged food stamp benefits for cash on August 1, 2002, starting around 12:30 a.m. and ending at around 1:30 a.m., for a total of $7,000 to $9,000 in charges. Haddad admitted that he instructed his employees to exchange food stamps for cash and that he had been making similar transactions for about a year.

At trial, Daniel Berwick, an IRS special agent, explained the financial analysis he had conducted from R&F's bank records and other financial data. His goal was to determine if any money laundering had occurred and to see whether R&F's food inventory purchases justified its food stamp benefit redemptions. He examined the bank records for the R&F account at Marquette National Bank, the account Haddad listed on his Food Stamp Program application for food stamp benefit reimbursements. Haddad and his wife Ferial were the only signatories on the account.

By analyzing the source of the deposits, Agent Berwick determined that of the $1,057,342.72 deposited in the account from April 7, 2000 through August, 2002, $1,056,962.41 consisted of electronic reimbursements from the Food Stamp Program and only $345.31 were from cash deposits. Agent Berwick then analyzed the withdrawal and debits on the account. He prepared a schedule that sorted the withdrawals and debits into several categories, essentially breaking down Haddad's business account. Agent Berwick also prepared a chart that itemized

Haddad's inventory into two categories: "inventory non-eligible items" and "inventory eligible items." By analyzing these two categories he compared the food inventory that could be purchased legally with a LINK card (the inventory eligible items) with the total LINK card deposits in the R&F account to determine if the inventory matched the reimbursements for LINK card transactions. He determined that only $45,748.34 in the account was used to purchase "inventory eligible items." On the other hand, the Haddads received $708,546.14 from the account in the form of checks written to themselves or to their personal account at First Savings Bank of Hegewisch.

The two checks that formed the basis for the Section 1957 charges were signed by the Haddads and both checks were in excess of $10,000. Check number 1797, dated June 4, 2002, was for $16,000 and was payable to First Savings Bank of Hegewisch. It was signed by both Anwar and Ferial Haddad. Check number 1812, dated July 6, 2002, was for $15,000, and was payable to Anwar Haddad and signed by Anwar and Ferial Haddad. Almost all (99.96%) of the deposits into the R&F account at Marquette Bank were for food stamp reimbursements. After deducting the costs for the purchase of food inventory, Agent Berwick could not account for over one million dollars of food stamp reimbursements in R&F's records.

## II. Analysis

### A. Entrapment

Haddad argues that the district court erred by barring the defense of entrapment at trial. We review a district court's refusal to instruct the jury on entrapment *de novo*. *United States v. Santiago-Godinez*, 12 F.3d 722, 726 (7th Cir. 1993).

Prior to trial, Haddad filed a motion notifying the district court and the government that he planned to use the

defense of entrapment. Haddad argued that in his post-arrest interview, he denied ever engaging in food stamp trafficking prior to the transaction with the CI and that both he and his employees refused requests to traffic in food stamps prior to August 1, 2002. He explained that he only relented because the CI persisted at length, implied that she was a prostitute ("I hustle"), and said that she really needed the money. The government moved to bar the defense of entrapment, arguing that Haddad's proffered facts were insufficient as a matter of law. Judge Robert Gettleman deferred ruling on the government's motion until he had considered the evidence at trial. Haddad based his defense on the tape-recorded conversation between the CI and Haddad.

Judge Gettleman refused to give the entrapment instruction. He explained that Haddad needed to offer other evidence of entrapment because the tape recording alone was not enough to justify an entrapment instruction.

In order to warrant an entrapment instruction, a defendant must "present sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crimes charged." *Santiago-Godinez*, 12 F.3d at 727. If the defendant meets this minimum threshold, only then can he present the question of entrapment to the jury. *Id.* To raise the entrapment defense, the defendant must show evidence for each of the two prongs of entrapment: government inducement of the crime and a lack of predisposition on the part of the defendant to engage in the crime. *Mathews v. United States*, 485 U.S. 58, 63 (1988). The burden of defeating the entrapment defense shifts to the government only when the defendant can establish both inducement and a lack of predisposition. *Santiago-Godinez*, 12 F.3d at 728.

Here the evidence and testimony showed that Haddad was predisposed to trafficking in food stamps well before

the CI approached him. In his post-arrest statement, Haddad admitted that he had been engaging in food stamp fraud for at least one year before his arrest. Further, he admitted that his employees had begun exchanging cash for LINK card transactions around midnight on August 1, 2002, that they had accepted several LINK cards (approximately 80), and had exchanged between $5,000 and $6,000 in cash for approximately $7,000 to $9,000 in food stamp benefits within a two-hour period. Casting doubt on Haddad's claims, the food stamp transactions in the early morning hours of August 1 were almost all for $49.99, the transactions were often only 30 seconds apart, and the majority of customers were not carrying bags of food when they left the store. All of this activity occurred several hours before the CI approached Haddad.

Moreover, Haddad was not an unwilling participant in the exchange of food stamp benefits for cash. When the CI requested the transaction, Haddad said not right now, and then a moment later went ahead with the exchange. A defendant is not entitled to offer an entrapment defense solely by asserting that he hesitated when offered the opportunity to commit the crime. We have previously held that "[w]henever a criminal defendant so promptly avails himself of a criminal opportunity, it is unlikely that an entrapment defense will warrant a jury instruction." *United States v. Mahkimetas*, 991 F.2d 379, 386 (7th Cir. 1993).

Regarding the inducement prong, Haddad argues that the CI induced him into exchanging food stamp benefits for cash by pleading with him and explaining her desperation for money. Further, Haddad contends, the CI flirted with him and indicated that she was a prostitute, which hinted at her willingness to engage in sexual activity if he helped her out. But, our precedent is clear that if the defendant accepts a criminal offer without being offered extraordinary promises, he demonstrates his predisposition to commit the type of crime involved. *United States v.*

*Evans*, 924 F.2d 714, 718 (7th Cir. 1991). For an entrap-
ment defense to be proper, Haddad needed to show an
extraordinary inducement, "the sort of promise that would
blind the ordinary person to his legal duties." *Evans*, 924
F.2d at 717. If a person takes advantage of a simple,
ordinary opportunity to commit a crime—"not an extraordi-
nary opportunity, the sort of thing that might entice an
otherwise law-abiding person"—then the person is not
entrapped. *Id.*

Haddad reaped only an ordinary profit from his transac-
tion with the CI (that is, he took his usual cut of approxi-
mately half of the charged food stamp transaction). He
argues that the CI's flirting and subtle hints of prostitution
escalated the matter to an extraordinary opportunity, but
the transcript indicates that the CI never made an offer of
sex for the LINK card cash exchange. Rather, the CI flirted
with Haddad and only *after* he made the cash for food
stamp benefits transaction did she say she would come by
later in the evening to see him. We agree with Judge
Gettleman that these facts did not rise to the level of an
extraordinary promise and thus Haddad's entrapment
defense was properly denied.

## B.  Sufficiency of the Evidence

Haddad next argues that the evidence was insufficient to
support his conviction on two counts of money laundering
under 18 U.S.C. § 1957. The statute imposes criminal
sanctions for knowingly engaging in or attempting to
engage in a monetary transaction in criminally derived
property that is valued greater than $10,000 and is derived
from specified unlawful activity. 18 U.S.C. § 1957(a). We
must determine "whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of
fact could have found the essential elements of the crime
beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.

307, 319 (1979). We review the district court's interpretation of the statute *de novo. United States v. Shriver*, 989 F.2d 898, 901 (7th Cir. 1992).

The government based the Section 1957 charges against Haddad on check numbers 1797 (dated June 4, 2002) and 1812 (dated July 6, 2002). The checks were drawn on Haddad's account at Marquette National Bank and were for $16,000 and $15,000, respectively. The court admitted the bank statements for the R&F account, including the statements for June and July 2002. The June 2002 statement reflected a beginning balance of $6,309.55, and after the transfer of funds for food stamp reimbursements in the first five days of June, the total amount in the account was $23,578.82. Checks totaling $5,450 were deducted from the account before check number 1797 was posted. Therefore, at the time check 1797 was posted, there was $18,128.82 in the account. The July 2002 statement reflected a beginning balance of $2,107.66 and after the transfer of funds for food stamp reimbursements from July 1-8, the total amount deposited in the account on July 8, 2002 was $27,333.53. Checks totaling $6,784.62 were deducted from the account before check number 1812 was deducted. At the time check number 1812 posted on July 8, 2002, there was $20,548.91 in the account.

According to the USDA's records, nearly 100% (99.96%) of the deposits into the R&F account consisted of food stamp reimbursements from electronic benefit transfers. Only $345.31 in cash was deposited into the account between April of 2000 and August of 2002 and no checks were deposited into the account. Agent Berwick's inventory calculations revealed that after deducting the costs for the purchase of food inventory, R&F's records cannot account for $1,012,358.10 of food stamp reimbursements.

Haddad argues that the government did not sufficiently prove that at least $10,000 of the checks in question

contained illegitimate funds. Yet, as the government illustrated with Agent Berwick's analyses and testimony, Haddad commingled legitimate and illegitimate business funds in the R&F business account at Marquette Bank.

Although this is a question of first impression for our Circuit, some of our sister circuits have addressed the issue of commingled funds and the sufficiency of the evidence in 18 U.S.C. § 1957 cases. In similar cases, under 18 U.S.C. § 1956, we have reasoned that "[w]e cannot believe that Congress intended that participants in unlawful activity could prevent their own convictions under the money laundering statute simply by commingling funds derived from both 'specified unlawful activities' and other activities." *United States v. Baker*, 227 F.3d 955, 965-66 (7th Cir. 2000) (citation omitted). The government does not need to trace every dollar of income and connect it to a specific instance of laundering. *Id. See also United States v. Smith*, 223 F.3d 554, 576 (7th Cir. 2000) (the government need only show that the transaction involved some funds which were derived from some illegal activity).

The Fourth and Fifth Circuits employ an analogous approach to commingled funds in Section 1957 cases. In *United States v. Moore*, the Fourth Circuit held that "where the funds used in the particular transaction originated from a single source of commingled illegally-acquired and legally-acquired funds or from an asset purchased with such commingled funds, the government is not required to prove that no 'untainted' funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity." 27 F.3d 969, 976 (4th Cir. 1994).

The Fifth Circuit's similar approach in *United States v. Davis* is also instructive. 226 F.3d 346 (5th Cir. 2000). In *Davis*, the Fifth Circuit applied its approach for commingled transferred funds to the commingling of funds for money

laundering convictions. As the Fifth Circuit explained, "when tainted money is mingled with untainted money in a bank account, there is no longer any way to distinguish the tainted from the untainted because money is fungible." *Id.* at 357.

While Haddad urges us to adopt the Ninth Circuit's approach to Section 1957 cases, we find that framework untenable. In *United States v. Rutgard*, the Ninth Circuit held that in the case of a withdrawal of funds from a commingled account, the government could only prove that illegitimate funds were withdrawn if all of the funds in the account are proven to be criminally derived. *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997). We have held in the analogous area of Section 1956 cases that the *Rutgard* "all or nothing" approach is unworkable. *See United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991) (Explaining that the government need not trace all the funds in a bank account to the illegal transaction).

In this case, the government proved aggregate withdrawals of far more than $10,000 above the amount of clean funds available; the vast majority of funds transferred to the Haddad's business account from the food stamp reimbursements were not supported by evidence of legitimate food sales. We adopt the Fourth and Fifth Circuit approaches to the Section 1957 cases and therefore find that the evidence to convict Haddad on money laundering was sufficient.

## C. Supplemental Jury Instruction

Haddad next argues that the supplemental jury instruction for the Section 1957 charges violated his rights under the Fifth and Sixth Amendments. At the close of the trial, Judge Gettleman instructed the jury that in order to find defendant guilty for the two counts charged under 18 U.S.C. § 1957, the government needed to prove beyond a

reasonable doubt that, "[f]irst, the defendant engaged or attempted to engage in a monetary transaction. Second, the defendant knew the transaction involved criminally derived property. Third, the property had a value greater than $10,000. Fourth, the property was derived from wire fraud. Fifth, the transaction occurred in the United States." During their deliberations, the jury sent a note asking "as to the fourth proposition that the property is derived from wire fraud: If some part of the source was legitimate funds, and some part was not, is money drawn on the <u>combined</u> moneys considered derived from wire fraud?"

Judge Gettleman presented the note to the parties and proposed a supplemental instruction that said, "For each of the checks in question, at least $10,000 must be in criminally derived property." Haddad's counsel agreed and stated, "yes. I think [ ] in order to convict, you must find beyond a reasonable doubt that at least 10,000 of the checks are derived from mail fraud—from wire fraud of the checks in question." Judge Gettleman then incorporated defendant's suggestions into the supplemental instructions so that it stated, "For each of the checks in question in Counts 2 and 3, you must find beyond a reasonable doubt that at least $10,000 is derived from wire fraud."

Waiver occurs when a defendant intentionally relinquishes a known right and it precludes appellate review. *United States v. Murry*, 395 F.3d 712, 717 (7th Cir. 2005). Forfeiture occurs when a defendant accidentally or negligently fails to assert his or her rights in a timely fashion. *Id.* A forfeited error is reviewed for plain error. *United States v. Staples,* 202 F.2d 992, 995 (7th Cir. 2000).

While the government urges us to find defendant's response to the supplemental jury instruction as waiver, it seems to us that counsel's agreement with the "at least $10,000" part of the supplemental instruction was an oversight and, therefore, was accidental rather than

deliberate. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005). Yet, the supplemental instruction failed to properly instruct as to a statutory element of the offense; it should have defined the value of criminally derived property as "in excess of $10,000." But, the error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999).

Based on the evidence at Haddad's trial, the error is harmless. The case did not turn on whether exactly $10,000 versus $10,001 of the funds were processed. Rather, the charges were for checks that were well in excess of the $10,000 minimum, $16,000 for Count 2 and $15,000 for Count 3. We conclude that a rational jury would have found the defendant guilty absent the error.

## IV.  Loss Amount

Lastly, Haddad argues that the trial court erred in accepting the government's loss calculation at sentencing. In the post-*Booker* era, we continue to review the district court's factual findings at sentencing for clear error and the application of those facts to the Sentencing Guidelines *de novo*. *United States v. Arnaout*, 431 F.3d 994, 998 (7th Cir. 2005).

At sentencing, Judge Gettleman determined that Haddad's offense level was 24 based on a loss amount of $801,067.03 and a criminal history of Category I. Judge Gettleman sentenced Haddad to 51 months' imprisonment and two years of supervised release.

To calculate loss amount in food stamp fraud cases, we have held that a trial court may calculate the defendant's aggregate food stamp redemptions for the period in question and subtract the estimated value of actual food sales. *United States v. Barnes*, 117 F.3d 328, 334-35 (7th Cir.

1997). Thus, to calculate the loss amount, the government estimated R&F's actual food sales using Haddad's reported $127,938 in gross sales for 1998, financial records pertaining to R&F, and R&F's tax returns. At trial, Agent Berwick testified that the government's best estimate of Haddad's legitimate food purchases, based on an analysis of bank records, receipts found in the store, and invoices subpoenaed from vendors, was $69,978. Factoring in a typical grocery markup, Agent Berwick estimated that R&F's gross food sales were approximately $104,967.05. After subtracting the estimated food sales from the food stamp redemptions, Agent Berwick determined that $1,102,358.10 of the food stamp redemptions could not be accounted for by R&F's food purchases during the relevant period of time. Thus, after giving Haddad a substantial benefit of the doubt, the loss figure of $801,067.30 represented the best estimate of loss based on the reliable evidence available to the government.

The method Agent Berwick used in this case is similar to that used in *United States v. Alburay*, 415 F.3d 782, 798-90 (7th Cir. 2005). In *Alburay*, we noted that the use of the estimated food sales in a store's application to participate in the Food Stamp Program is an adequate calculation of legitimate food sales. After all, the estimate is used for the store's Food Stamp Program application and is on a "federal form that he signed, swore to, and never sought to amend." *Id.* at 790. Although Haddad argues that his illiteracy demonstrates that he cannot be responsible for the figure he offered on his Food Stamp Program application, we conclude that he had the opportunity to change his application when it was verbally reviewed with him during the application process. The amount of loss figure therefore is not clearly erroneous.

## III.  Conclusion

Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*