In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2267

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANNY W. ORR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:06-cr-20074—**Michael P. McCuskey**, *Chief Judge.*

ARGUED OCTOBER 9, 2009—DECIDED SEPTEMBER 27, 2010

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In various conversations online and by telephone, Danny W. Orr attempted to convince a woman he met online to move to Michigan with her three- and five-year-old daughters for the purpose of "training" them to become sexual "slaves." The woman eventually agreed, and Orr purchased train tickets for her and the two children. Unbeknownst to Orr, however, the "woman" with whom he was com-

municating online was actually a male police officer conducting an undercover investigation into internet child exploitation. Orr was charged with attempting to persuade or induce a minor to travel in interstate commerce to engage in sexual activity and using a facility of interstate commerce to do so, in violation of 18 U.S.C. § 2422(a) and (b). A jury found Orr guilty on both counts. Orr appeals his conviction, arguing that the district court should have granted his motion for acquittal based on an entrapment defense that he never raised during trial. Because we find that Orr cannot establish either of the required elements for an entrapment defense, we affirm.

## I. BACKGROUND

In 2006, the Decatur Police Department initiated an undercover sting operation to investigate internet crimes against children. As part of this operation, Detective Jeremy Welker created a fictional persona by the name of Jennifer Spaden and established a Yahoo account with the username "jenmomam." Spaden's profile depicted her as a 34-year-old woman from Decatur, Illinois, who had two daughters aged three and five. Using the profile, Welker entered an online chat room called "Fetishes", which allowed others in the room to see Spaden's screen name, access her profile, and send her

instant messages. Shortly after Spaden[1] entered the chat room, Orr, using the screen name "master_corps1", sent her an instant message saying, "Are you training your girls, Jenn?" Orr went on to describe how he had been "training" his 12-year-old stepdaughter to perform sexual acts since the age of four. He also discussed in sexually explicit terms the various types of "training" Spaden's daughters could engage in at their young age.

The next day, Orr initiated another conversation with Spaden in the Fetishes chat room. Again, he raised the issue of training Spaden's daughters and suggested that Spaden come visit him in Michigan for a vacation. Orr said that Spaden "might like it and want to stay" and that he "could help train the girls too." Spaden said that she did not have very much money, to which Orr replied that he could help her relocate to Port Huron, Michigan, including an offer to buy a house for Spaden and her daughters. Orr also sent Spaden seven images of young girls engaging in sexual acts. According to Orr, the girls in the pictures had been trained "at a very young age." Orr claimed that he had trained two of the girls in the pictures when they were six and eight years old.

In subsequent conversations, Orr continued to press Spaden about her potential visit to Michigan. At one point, Spaden said that she was interested in visiting

---

[1] The opinion will generally refer to Jennifer Spaden, the fictional character, and not the officers who were impersonating her online.

but did not know how she would get there. Orr responded, "I will get you here." Spaden then asked, "How will me and the girls get there though?", and Orr replied, "I would get you bus or train tickets or come and get you." Orr then reiterated his interest in training the girls, and when asked for details about what the training would include, explained in explicit terms that he would teach them to perform and receive oral sex. He also suggested that Spaden engage in sexual acts with him while the girls watched. As the conversation continued, Spaden asked Orr if he was "just saying all of this," to which Orr said "no. . . . for real[,] I want you and the girls." Orr also told Spaden that, when she and her daughters moved to Michigan, she should not register the five-year-old for school; instead, Orr suggested that he could home-school the children so that they would not inadvertently reveal to anyone that they were "training as slaves." Orr then asked to speak to Spaden by telephone, to which she agreed and gave him her telephone number. Detective Janette Carlton posed as Spaden during the call. According to Carlton, Orr said that he wanted Spaden to move to Michigan with her children so that he could train them to be sex objects.

Spaden and Orr continued to talk online and on the telephone over the next few weeks. The topics of discussion ranged from sex to innocuous subjects like Spaden's dislike of Decatur and how she found it to be boring. During one conversation, Spaden suggested that Orr drive to Decatur and take her back to Port

Huron so they could look at houses together while her cousin stayed with her daughters. Orr suggested that Spaden take a bus instead. Orr and Spaden eventually agreed that Orr would drive to Decatur on Labor Day, stay two days, and then drive Spaden back to Port Huron. Orr also volunteered to help Spaden bathe the girls after he arrived in Decatur. Orr later said that they would have "lots of fun" and "a lot more fun" when the girls started training after Spaden got settled in Michigan.

Two days before Orr was supposed to leave Port Huron, Orr told Spaden that he was unable to make the drive but offered to pay for her round-trip train ticket. Spaden asked if she should bring her daughters with her, to which Orr responded, "Sure." The next day, Orr told Spaden in an online chat that he wanted to research the cost of train tickets for Spaden and her daughters to visit him. Orr expressed interest in also spending time alone with Spaden, and Spaden inquired about what they would do if her daughters accompanied her. Orr asked if Spaden preferred that her daughters not see them together yet, and Spaden stated that she was "fine with either." Orr then said, "ok if you['re] fine with it then bring them." He again mentioned the possibility of engaging them in sexual acts during this trip and after their permanent move to Michigan. Spaden said that she was "fine with either," and Orr responded, "bring them then." On September 5, 2006, Orr used his credit card to purchase train tickets from Amtrak in the names of Spaden and her daughters for travel from Decatur to Port Huron on September 11. He also sent Spaden an

email saying that he had reserved a hotel room for their stay.

On the day of the trip, officers from the Decatur Police Department arrested Orr and executed a search warrant for his house. There, they found Orr's computer, which contained archived chats between Orr and Spaden, as well as the images of child pornography that Orr sent to Spaden. Orr was charged with attempting to persuade, induce, entice, and coerce a minor to travel in interstate commerce to engage in sexual activity, in violation of 18 U.S.C. § 2422(a), and with using a facility of interstate commerce to so attempt, in violation of 18 U.S.C. § 2422(b).

At trial, Orr did not present any witnesses in his defense, nor did he mention entrapment. He simply requested a jury instruction that stated, "The defendant maintains that he did not intend to actually engage in the sexual activity that he wrote or talked about." The government objected on the grounds that the jury instructions already included an instruction on the definition of "attempt," which required proof of the defendant's intent to commit the offense. The district court denied Orr's proposed instruction. The jury found Orr guilty on both counts. Waiving argument, Orr moved for a judgment of acquittal, which the district court denied. He now appeals, arguing that the district court should have granted his motion for acquittal based on the defense of entrapment, which he raises for the first time on appeal. Orr does not raise any other challenge to his conviction.

## II. ANALYSIS

Orr's failure to assert the entrapment defense during trial constitutes forfeiture, so our review is limited to a search for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Doyle,* 121 F.3d 1078, 1089 (7th Cir. 1997) ("When a right is waived, it is not reviewable, even for plain error. In contrast, a right that is forfeited may be reviewed under the plain error standard set forth in Rule 52(b) . . . .") (citation omitted). Plain error is a rigorous standard under which reversal is only allowed if "the error [ ] causes a miscarriage of justice, in the sense of seriously affecting the fairness, integrity or public reputation of judicial proceedings." *United States v. Patterson,* 241 F.3d 912, 913 (7th Cir. 2001) (citation and internal quotation marks omitted). And of course, where there is no error at all, plain error cannot be found. *United States v. Ross,* 77 F.3d 1525, 1537 (7th Cir. 1996). Such is the case here. The district court did not err by denying Orr's motion to acquit based on a defense he never asserted at trial, particularly when the defense would not have been supported by the facts presented at trial.

As a preliminary matter, we reject Orr's argument that "the district court should have made the entrapment defense available to Mr. Orr." Such an argument ignores the burden of persuasion in affirmative defenses, which is placed squarely on the shoulders of the defendant claiming entrapment. *See United States v. Blassingame,* 197 F.3d 271, 279 n.2 (7th Cir. 1999) ("[E]ntrapment is an affirmative defense and it is well established that some minimal showing is required to

entitle a defendant to maintain an affirmative defense."); *United States v. Jumah,* 493 F.3d 868, 873 (7th Cir. 2007) ("[W]hen a statute is silent on the question of affirmative defenses and when the affirmative defense does not negate an essential element of the offense, we must presume that the common law rule that places the burden of persuasion on the defendant reflects the intent of Congress."). It was *Orr's* responsibility to raise the entrapment defense, as "it is most definitely not the responsibility of the prosecutor or the judge to do the work of defense counsel." *United States v. Gomer,* 764 F.2d 1221, 1227 (7th Cir. 1985) (citation and internal quotation marks omitted).

We conclude that any attempt by Orr to assert entrapment during trial would have been futile. A successful entrapment defense requires proof of two elements: (1) government inducement of the crime; and (2) lack of a defendant's predisposition to engage in criminal conduct. *United States v. King,* 75 F.3d 1217, 1223 (7th Cir. 1996) (citation omitted). A defendant must proffer sufficient evidence of both elements before the defense may be asserted. *United States v. Millet,* 510 F.3d 668, 675 (7th Cir. 2007).

### A. Government Inducement

As to government inducement, Orr's central argument is that, although he might have initially been willing to engage in certain criminal acts, he "changed his attitude at one point along the way," after which the police officers began to "entreat Orr with pleas based on sym-

pathy in order to induce him" to commit the charged offense. But this argument suffers from a fatal flaw: the record contains no indication that Orr changed his mind or that his original desire to help "train" Spaden's daughters ebbed at any point. To the contrary, it was Orr that initiated the discussions about "training" Spaden's daughters and continued to do so until the time of his arrest. Spaden's Yahoo profile did not contain any sexual information. Yet, without provocation, Orr initiated contact with Spaden, and his first comment to her was an inquiry about sexually abusing her children. As their internet relationship progressed, Orr continued to press forward with his plan, as demonstrated by his repeated affirmations that Spaden should bring her daughters on the Michigan trip, even when presented with the express option that they not come with her. When first asked if Spaden should bring her daughters, Orr responded, "Sure." Later, when they were confirming the details of the trip, Spaden told Orr that she was "fine" with either allowing the girls to see them together or not, and Orr twice told her to "bring them." All of these statements evince Orr's continued interest in abusing Spaden's daughters, particularly in light of the fact that the entire purpose of Spaden's visit to Michigan was to search for a home where she and her daughters could live permanently—the final step in Orr's plan to have full access to the children he planned to abuse.[2]

---

[2] Contrary to Orr's assertions, the record does not indicate that he "expressed reservations" about Spaden bringing her

(continued...)

   Orr also contends that the officers made "repeated entreaties for Orr to reconsider and to carry out the criminal acts in which he had lost interest." Orr is apparently referring to Spaden's statements about disliking Decatur, but these statements do not rise to the level of "extraordinary inducement" required to maintain an entrapment defense. *See United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006) (requiring defendant to prove that government inducement was "extraordinary inducement, the sort of promise that would blind the ordinary person to his legal duties") (citation and internal quotation marks omitted). Where, as here, the government simply invites the defendant to participate in the crime and does not "employ[ ] any pressure tactics or use[ ] any other type of coercion" to induce the defen-

---

(...continued)

daughters on the Michigan trip. Orr emphasizes that, when asked whether Spaden should bring her daughters with her, Orr said, "I don't mind either way." Even if this statement did indicate hesitation—which we do not believe it does—it would not entitle Orr to an entrapment defense, as a "defendant is not entitled to offer an entrapment defense solely by asserting that he hesitated when offered the opportunity to commit the crime." *United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006). Further, when viewed in the context of other statements made during the same conversation (in which Orr referenced training the girls to perform oral sex and mentioned his concern that *Spaden* would change her mind about the trip), Orr's comment does not indicate any reservation or an abandonment of his plan to sexually abuse the children.

dant, a defendant is not entitled to an entrapment defense. *United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995); *see Haddad*, 462 F.3d at 790 ("If a person takes advantage of a simple, ordinary opportunity to commit a crime—'not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person'—then the person is not entrapped."). That Spaden commented more than once about her desire to leave Decatur does not transform an otherwise common complaint into an extraordinary one. *See Akinsanya*, 53 F.3d at 858 ("[P]ersistence is not alone sufficient to carry the case beyond an ordinary opportunity.") (citation and internal quotation marks omitted). To the extent that Orr argues that Spaden's suggestion that he come pick her up from Decatur constitutes inducement, his argument is also meritless. It is well-settled that, absent extraordinary promises, making a defendant a criminal offer does not constitute government inducement. *Haddad*, 462 F.3d at 790.

### B.    Predisposition

Predisposition, the "principal element" of the entrapment defense, centers on "whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988). We consider several factors in assessing whether a defendant was predisposed to commit the charged offense: (1) the defendant's character or reputation; (2) whether the government initially suggested the

criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government. *Millet,* 510 F.3d at 676.

Here, all factors indicate that Orr was predisposed to commit the charged offense. As noted earlier, Orr was the one that first suggested training Spaden's daughters, and he encouraged Spaden to acclimate the girls to sexual acts. Orr also stated repeatedly that he wanted Spaden and her daughters to join him in Michigan, where he would train the girls to be sex slaves. And even beyond his suggestions about training Spaden's children, Orr boasted about having trained his 12-year-old stepdaughter since she was four years old (including penetration at age six), as well as two of the girls depicted in the pornographic images he sent to Spaden. These actions do not fit the profile of an "unwary innocent." To the contrary, Orr's explicit statements about his desire to sexually abuse Spaden's daughters coupled with his bragging about molesting other children is more than sufficient to show that he was predisposed to commit the charged offense. Where, as here, "the defendant was simply provided with the opportunity to commit a crime, the entrapment defense is of little use because *the ready commission of the criminal act* amply demonstrates the defendant's predisposition." *Akinsanya,* 53 F.3d at 858 (emphasis in original).

### III. CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.