In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1249 & 10-1956

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AUGUSTUS WRIGHT and RAYMIE HENDERSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cr-00106—**Elaine E. Bucklo**, *Judge.*

ARGUED MAY 6, 2011—DECIDED JULY 12, 2011

Before BAUER, KANNE, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. Augustus Wright and Raymie Henderson were convicted by separate juries of conspiring to engage in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1956. Henderson was additionally convicted of engaging in a monetary transaction in criminally derived property, in violation of 18 U.S.C. § 1957. On appeal, Wright and

Henderson ask us reverse their convictions and/or
remand their cases for new trials on several grounds:
(1) the judge erred in denying a motion to dismiss
because the indictment was too late to satisfy the statute
of limitations; (2) the evidence was insufficient to
convict them; and (3) certain jury instructions were in
error. Wright also argues that the judge erred in finding
some bank records to be immaterial and in prohibiting
his counsel from using the phrase "statute of limita-
tions" in his opening statement and closing argument.
Henderson independently argues that: (1) the judge
erred in admitting hearsay testimony regarding Wright's
statements to law enforcement officers in violation of
the Confrontation Clause; (2) the government made
improper closing argument comments which denied
him a fair trial; and (3) the judge erred in calculating
his advisory sentencing guideline range. We begin with
the facts as established at the trial and viewed, as they
must be, in the light most favorable to the jury verdict.

In 2001, James Williams, a drug dealer and gang
member, approached his longtime friend, Wright—the
owner of South Shore Imports, a car repair shop—about
"cleaning up" his drug proceeds and those of a fellow
dealer, Kenyatta Coates. Initially Wright was hesitant,
but he ultimately agreed to meet with Coates and
Williams to discuss the arrangement. The scheme was
straightforward: Coates and Williams would give
Wright their drug proceeds, Wright would buy real
estate and return to Coates and Williams real estate
and/or cash equivalent to the amount he had been
given. Shortly after the meeting, Williams gave Wright

a backpack containing $800,000 in rubber-banded stacks of cash—all of it was drug proceeds, or, to use the defendant's words, "street money."

In May 2001, Wright gave $240,000 of the drug proceeds to Nowell Patrick Lando,[1] one of his employees at South Shore Imports, who was also involved in real estate. Lando, who himself was a drug dealer and gang member, knew that he was receiving street money. Wright told Lando to invest the money in real estate and return the equivalent value in real estate or cash one year later. Lando agreed.

Lando and Henderson were partners in R&P New Development, a real estate investment and renovation company. Henderson had experience in the purchase and renovation of real estate, and Lando was the source of financing for their projects. After he received the $240,000 in drug proceeds from Wright, Lando told Henderson that he had received a substantial sum of street money. Henderson asked for half, but Lando refused, and ultimately they decided to use the money to buy real estate.

In June 2001, Lando and Henderson brought $100,000 of the cash in a backpack to S.I. Securities—a business that purchased delinquent real estate tax certificates— and arranged to buy seven properties. Henderson took the money and went into another room with John Bridge, who worked at S.I. Securities. When Lando and

---

[1] Lando was also charged in the indictment, but he agreed to testify against his co-defendants.

Henderson left, Lando understood that R&P had pur-
chased seven properties and that they would not im-
mediately receive title to them because the properties
were in tax foreclosure. Over the next few months, S.I.
issued deeds to R&P for each of the seven properties,
including a property located at 203 East 17th Street in
Chicago Heights ("203 17th"), for which Henderson
made a cash payment of $8,000.[2] Each of the properties
purchased with Coates' and Williams' drug proceeds
was held in R&P's name.

Lando and Henderson also used a portion of the
$240,000 to pay off the balance due on a property located
at 10951 S. Michigan Avenue ("10951 Michigan")—which
Henderson had arranged to purchase before Lando re-
ceived the cash from Wright. They then spent between
$50,000 and $75,000 of the drug proceeds renovating the
property. Once their real estate plan got going, Lando
informed Henderson that the money had come from
Wright, and he told Wright that the drug money had
been used to purchase and renovate properties.

A few months later, Coates began questioning Wright
about his money. Wright met with Lando and Coates
so that Lando could explain to Coates how the money
was spent. Prior to this meeting, Lando did not know
that the drug proceeds originated with Coates and Wil-
liams. Wright had only told him that the money belonged
to some "street guys," which Lando understood to mean

---

[2] Henderson had previously put down $2,000 in "clean
money" on this property.

gang members and drug dealers. At the meeting, Lando gave Coates a fake list of properties he said he bought with the $240,000 Wright had given him. Coates told Lando that he had given Wright more than double that amount and that he was holding Wright and Lando accountable for the money. Lando told Henderson about the meeting and said he thought it was safer to just get Coates his money. Henderson assured Lando they would find a way out of the situation.

In 2002, Wright, Lando, Coates, and Bruce Brown, Coates' "financial advisor,[3]" met to discuss the unresolved debt. At the meeting, Lando produced a list of the actual properties he and Henderson had purchased with the drug proceeds and offered them to Coates to cover the $240,000 they owed, but Coates declined.

R&P dissolved in 2002, due in part to the pressure to repay the debt to Coates and Williams. Lando and Henderson divided between them the properties they had purchased with the drug proceeds. Lando, thinking he held title to 10951 Michigan (at the time worth more than $240,000) offered the property to Coates in order to resolve the debt. But when Lando tried to transfer the title to Wright for the benefit of Coates, he

---

[3] Wright and Lando, concerned that Brown was telling Coates they had stolen his money, later arranged to have Brown killed. They hired Deron Hobbs, who shot Brown, but did not kill him. The government presented evidence of the shooting at Henderson's trial but not at Wright's.

learned that the property was still in Henderson's name. Lando unsuccessfully tried to contact Henderson to transfer the property.

Eventually, in May 2002, Henderson gave Wright a warranty deed for 10951 Michigan. Unfortunately for Henderson, he did not have title to the property—he only possessed a contractual right to purchase it from Sherwyn Real Estate, the title-holder. Sherwyn conveyed the title by quitclaim deed to Henderson in November 2002. Finally, on February 7, 2003 (a critical date as we shall see), Henderson, at the insistence of Wright's lawyer, executed a quitclaim deed to Wright. The deed stated that the purpose was to "correct and modify previously recorded deed." The corrected deed was recorded by the Cook County Recorder of Deeds on April 24, 2003. On October 10, 2003, Henderson sold 203 17th for approximately $92,500, receiving $49,623,20 in proceeds.

On February 5, 2008, Wright and Henderson were indicted and charged with conspiring to engage in monetary transactions in criminally derived property, in violation of § 1956 (Count One). Henderson was also charged with engaging in a monetary transaction in criminally derived property, in violation of § 1957 (Count Two). Wright and Henderson filed a motion to dismiss Count One as untimely, and Henderson filed a motion to dismiss Count Two for failure to state an offense under § 1957. The district judge denied both motions and subsequently ordered that the trials of Wright and Henderson be severed.

At Wright's trial, a jury convicted him of violating § 1956. Following his conviction, he moved for a new trial, based on *Brady v. Maryland*,[4] when it became clear the government had bank records showing that R&P used checks to pay for the renovation of 10951 Michigan. Wright argued that if work was done with funds from R&P's legitimate bank account, and not with the drug money, it would contradict and impeach the testimony of two of the government's star witnesses—Lando and James Robert Thomas (another co-conspirator). Initially the judge denied Wright's motion for a new trial, but after Wright moved to reconsider, the judge granted the motion and ordered a new trial, citing potential credibility issues with Lando and a lack of confidence the jury would have reached the same conclusion if the bank records were in evidence.

Several months later, Wright moved to exclude as "not relevant" the same bank records he claimed caused the *Brady* violation. The government, accordingly, asked the judge to reconsider the order granting a new trial to Wright. The government stated that because Wright was now arguing that the bank records were irrelevant, they were neither exculpatory nor material and thus would not support the previous finding of a *Brady* violation. The judge agreed, granted the government's motion to reconsider, found that the records were not material and would not have changed the outcome, and reinstated the jury verdict. The judge then sentenced Wright to 103-months' imprisonment.

---

[4]  373 U.S. 83 (1963).

At Henderson's trial, the government called FBI Special Agent Donald Kaiser, Jr., to testify. During Kaiser's testimony, the government elicited statements made by Wright during his interviews with law enforcement. Wright, of course, did not testify at Henderson's trial. After hearing Kaiser's testimony, as well as the testimony of several other witnesses—including Lando—and being presented with evidence in the form of property deeds and bank records, the jury convicted Henderson on Counts One and Two. The judge sentenced Henderson to 69-months' imprisonment.

The make-or-break issue on this appeal is whether the prosecution of Wright and Henderson got started before the five-year statute of limitations clock ran out. The defendants were indicted, as we have said, on February 5, 2008. Too late, say Wright and Henderson, because the conspiracy ran out of gas on May 26, 2002, when its last act—Henderson's execution of the warranty deed conveying 10951 Michigan to Wright—occurred. If they are right, the indictment came almost nine months too late.

A conspiracy, however, does not wrap up until "the occurrence of the last act in furtherance" of it is completed. *United States v. Yashar*, 166 F.3d 873, 876 (7th Cir. 1999). And here, the government claimed that the execution and filing of the quitclaim deed regarding the transfer of 10951 Michigan from Henderson to Wright on February 7, 2003, was an act done in furtherance of the conspiracy. So, the government argued, the February 5, 2008, indictment, albeit only by

two days, got the case off the ground before the statute of limitations buzzer went off. We think the government has the better argument.

Although no funds were exchanged in connection with the quitclaim deed, it corrected the warranty deed that was the underlying money laundering transaction, and thus the quitclaim deed was a necessary act done in furtherance of the initial aim of the conspiracy, which was to conceal the original source of the proceeds. *See United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002). The goal of the conspiracy was to clean up drug proceeds through the purchase of real estate. The execution of the February 7, 2003 quitclaim deed, transferring property from Henderson to Wright for the benefit of Coates, was an overt act to conceal the nature of the drug money and thus an act in furtherance of the money laundering conspiracy. Therefore, the indictment was timely.

Wright and Henderson next challenge the sufficiency of the evidence against them. Here, they face a "nearly insurmountable hurdle . . . we view *all* the evidence and draw *all* reasonable inferences in the light most favorable to the [government]." *United States v. King*, 627 F.3d 641, 651 (7th Cir. 2010) (internal citation omitted). To establish a conspiracy to launder money, the government must prove that a defendant "was knowingly involved with two or more people for the purpose of money laundering and that he knew the proceeds used to further the scheme were derived from an illegal activity." *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005). Unfortunately for Wright and Henderson, the

government presented the jury with more than enough evidence to prove them guilty of conspiracy.

At trial, the government argued that Wright and Henderson conspired with Lando, Coates, and Williams to launder Coates' and Williams' drug proceeds by investing them in real estate. The jury heard testimony from Williams and Lando (as well as others involved in the scheme). Lando testified that he received $240,000 in drug proceeds from Wright, that he and Henderson used the money to purchase and renovate properties, and that Henderson turned over 10951 Michigan to Wright for Coates' benefit. The government also introduced into evidence property deeds recorded by the Cook County Recorder of Deeds. Lando's and Henderson's names appeared on all of the deeds, despite the fact that Coates' and Williams' drug money was used to purchase the properties. And at the time Henderson executed the warranty and quitclaim deeds to Wright, he knew the aim of the transfer was to satisfy the debt owed to Coates.

Wright and Henderson also argue that the February 7, 2003, quitclaim deed was not an act in furtherance of the conspiracy because Henderson executed the deed at the request of Wright's attorney. The reason for the corrected deed is immaterial—as we have found, the correction was for the benefit of Coates' and Williams' money laundering scheme and thus was in furtherance of the conspiracy. Given the abundance of facts, we agree that a reasonable jury could find Wright and Henderson guilty of a conspiracy under § 1956.

Henderson separately argues that there was insufficient evidence to prove he violated § 1957. In order to convict Henderson under § 1957, the government had to prove that when Henderson purchased 203 17th in Chicago Heights with drug proceeds, he "knowingly engag[ed] in or attempt[ed] to engage in a monetary transaction in criminally derived property that is valued greater than $10,000 and is derived from specified unlawful activity." *United States v. Haddad*, 462 F.3d 783, 791 (7th Cir. 2006). Henderson maintains that the government failed to prove its charge because the transaction involved less than $10,000 in drug proceeds. Henderson correctly notes that he used only $8,000 in drug proceeds to purchase 203 17th.[5] The government argues, however, that it is not the initial use of the $8,000 that violated § 1957, but rather Henderson's sale of that property resulting in $49,623.20 in proceeds. We think the government's theory puts too much stress on § 1957.

Section 1957 looks to the initial transaction, not the result that might be realized many years later. During oral argument, we asked the government's attorney this hypothetical question: If a person sold a marijuana cigarette for a dollar and then used the dollar to buy a lottery ticket which turned out to be a one million dollar winner, would that person be in violation of § 1957? The response was yes because the "financial transaction" should be viewed as including, for example, the cashing

---

[5] As noted, Henderson had previously put down $2,000 in clean money.

of the one million dollar lottery check at a bank. We think that goes too far. Similarly, if that same person used $1,000 in proceeds from selling marijuana to buy Apple stock in 2004, would he violate § 1957 if he sold that stock in 2011 for more than $31,000? We think not.

We have previously held that for a § 1957 conviction to be proper, criminally derived property "must first have existed, and then at a later time, the charged party must have attempted to bring about or have actually brought about a transaction with it." *United States v. Lee*, 232 F.3d 556, 559 (7th Cir. 2000) (internal citations omitted). Here, property was criminally derived when Wright gave the drug money to Lando and Henderson. The transaction triggering a § 1957 violation occurred when Henderson handed over $8,000 of that drug cash to purchase 203 17th. The government now asks us to allow it to choose ex ante to ignore this transaction and wait for the proceeds to increase in value beyond $10,000 in order to charge Henderson. We decline the invitation. Because the financial transaction involved less than the $10,000 minimum the statute requires, Henderson's conviction for violating § 1957 must be set aside.[6]

---

[6] We also note that under the government's theory, the statute of limitations would not begin to run until the sale of the property, or the receipt of the lottery earnings, even if this did not happen until twenty years after the criminally-derived proceeds were used for the initial purchase. This consequence of the government's reading of the statute is

(continued...)

Wright and Henderson also argue that the judge erred in her instructions to the jury. We review *de novo* whether jury instructions accurately state the law and look to the instructions as a whole to determine if, taken together, they convey the issues fairly and accurately." *See United States v. Johnson*, 584 F.3d 731, 739 (7th Cir. 2009).

Wright and Henderson argue that the judge incorrectly instructed the jury on the duration of the conspiracy and the statute of limitations. The instruction said:

> A conspiracy exists as long as any member of that conspiracy commits an act to further the original aims of the conspiracy to conceal and disguise the nature, source, the ownership or control of the proceeds.

The judge recognized that, because the parties disagreed about the last date of the alleged conspiracy and the statute of limitations was at issue, the jury needed an instruction to help it decide how long the money laundering conspiracy lasted. Her instruction properly lays out the elements the jury had to find in order for Wright and Henderson to be guilty of conspiracy under § 1956.

Henderson also independently argues that the instructions in his trial were confusing to the jury. We dis-

---

[6] (...continued)

equally troubling and reinforces our finding that the $10,000 must be present at the initial use of the illegal proceeds, not at the future sale.

agree. The judge correctly instructed the jury on money laundering conspiracy in violation of § 1956. And since we have determined that Henderson cannot be found guilty under § 1957, we need not decide whether the instruction was incorrect or confusing as to Count Two.

Henderson challenges the judge's instruction regarding knowledge. The jury was instructed that:

> When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.

According to Henderson, this did not allow the jury to find that if his actions occurred by mistake, accident, or ignorance, he could not be found guilty. Yet, as the government points out, this is exactly what this instruction provides. Henderson's challenges to other jury instructions are meritless and require no comment.

Next, we address Wright's argument that the judge erred in finding certain R&P bank records immaterial and in her resulting denial of a motion for a new trial. We review the decision only for an abuse of discretion. *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007).

In *Brady*, the Supreme Court held, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To prove a *Brady* violation, Wright must prove that "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government . . . ; and (3) the suppressed evidence resulted in prejudice." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). The judge ultimately found that the R&P bank records were neither impeaching nor exculpatory. We agree. Prior to his second trial, Wright moved to exclude the very evidence that he claimed caused a *Brady* violation in the first trial. He cannot have it both ways. Either the evidence is material or not; and by seeking to exclude the bank records, he made clear that the evidence was anything but material to impeaching Lando or to his overall defense. The judge did not abuse her discretion in reversing course and denying Wright's motion for a new trial.

Finally, Wright argues that the judge erred in prohibiting his counsel from using the phrase "statute of limitations" in his opening statement and closing argument. We give the judge great latitude in limiting arguments over "time consuming peripheral issues in the interests of judicial economy and reducing juror confusion." *United States v. White*, 472 F.3d 458, 462 (7th Cir. 2006) (quotations and citations omitted). Here, the judge prohibited Wright from using the phrase "statute of limitations" because it would only confuse the jurors. The judge explained that statute of limitations was an issue for the court, that Wright could still argue that the conspiracy ended in November 2002, and that if the

jury decided the conspiracy *had* ended in November 2002, the case would be dismissed. This was, under the circumstances, a legitimate restriction and not an abuse of the judge's discretion.

Henderson next argues that the admission of Agent Kaiser's hearsay testimony, about admissions that Wright made, violated his Sixth Amendment right to confront witnesses against him because Wright did not testify at his trial. We review *de novo* whether an evidentiary ruling violates the Confrontation Clause of the Sixth Amendment. *United States v. Adams*, 628 F.3d 407, 416 (7th Cir. 2010). We note that Henderson failed to object to Kaiser's testimony at trial. We review forfeited issues for plain error. *See United States v. DiSantis*, 565 F.3d 354, 362 (7th Cir. 2009).

Henderson is correct. The court erred when it allowed the government to elicit Wright's statements from Agent Kaiser during Henderson's trial. This is only helpful to Henderson, however, if the error was harmful. In determining whether an error is harmless, we consider factors such as "(1) the importance of a witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of corroborating or contradictory evidence; and (4) the overall strength of the prosecution's case." *Adams*, 628 F.3d at 417.

The government argues that the admission was harmless because Wright's statements were primarily about his own involvement and Lando's, not Henderson's; the admissions were cumulative of other evidence offered against Henderson (such as Williams'

and Lando's testimony and the quitclaim deed to Wright); and Wright's statements were corroborated by other witnesses and documentary evidence (such as Thomas' testimony, recorded conversations between Wright and Henderson, and bank records). The government is correct. Although the admission of Wright's statements through Agent Kaiser was in error, it was harmless. Everything Wright said was either cumulative, corroborative, or non-essential to the government's case.

Henderson also argues that remarks and conduct of the government were improper and denied him a fair trial. Henderson, however, did not object to any of the arguments he now raises on appeal, and so our review is only for plain error, which requires him "to establish not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010) (internal citation and quotation omitted). Henderson contends that the prosecutor made several statements during closing and rebuttal that were not substantiated by the evidence. In particular, he argues that comments regarding: (1) Henderson's role in signing 10951 Michigan over to Wright; (2) Henderson's motivation in turning over 10951 Michigan; (3) Henderson's knowledge of Lando's past when he chose him as his partner; and (4) the involvement of John Bridge, were unsubstantiated and improper. Henderson might not agree with statements the prosecutor made, but they were all reasonable inferences from the evidence presented to the jury. They were not in plain error, and Henderson was not denied a fair trial.

Finally, Henderson argues that the judge erred in calculating his guideline range. We review a judge's interpretation and application of the sentencing guidelines *de novo,* and her findings of fact for clear error. *United States v. Hill,* 563 F.3d 572, 577 (7th Cir. 2009). Henderson first argues that the judge incorrectly applied a criminal history point for his 1996 conviction for failure to transfer title, in violation of 625 ILL. COMP. STAT. 5/3-113, because it was a petty offense. But, as the government notes, under U.S.S.G. § 4A1.2(c) sentences for misdemeanor and petty offenses are generally counted when computing criminal history, except as specified in U.S.S.G. § 4A1.2(c)(1) and (2). We apply a common sense comparison to determine "whether the prior conviction is categorically more serious than the listed offenses." *United States v. Hagenow,* 423 F.3d 638, 645-46 (7th Cir. 2005) (internal citation and quotation omitted). Henderson's failure to transfer certificate of title 59 times is more serious than any of the driving-related offenses listed in § 4A1.2(c)(1). *See United States v. Boyd,* 146 F.3d 499, 502 (7th Cir. 1998). Thus, the judge correctly assessed one point to Henderson's guideline range.

Henderson also argues that the judge erred in finding that the value of the laundered funds was $240,000. To determine the value of funds involved in a money laundering conspiracy, the district court must look to Henderson's relevant conduct. *United States v. Baker,* 227 F.3d 955, 964 (7th Cir. 2000). That includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B).

The government argues that the judge correctly found the value attributable to Henderson was $240,000 because: (1) Lando brought $240,000 from Wright to the partnership; (2) Lando told Henderson he had received $240,000 in street money, and Henderson asked for half; (3) Henderson admitted to Thomas that Lando brought nearly a quarter million dollars to the table; (5) Lando and Henderson used $100,000 to purchase properties from S.I. Securities, and tens of thousands of dollars more to pay off and renovate 10951 Michigan; and (6) when Coates demanded his money, Henderson turned over 10951 Michigan (a property worth more than $240,000) to Wright for the benefit of Coates. Given the plethora of evidence, the judge correctly found that the value of laundered funds attributable to Henderson was $240,000.

Accordingly, we AFFIRM the convictions of Wright and Henderson under Count One of the indictment, but REVERSE Henderson's conviction on Count Two. With Henderson's Count-Two conviction out of the picture, his case is REMANDED to the district court for re-sentencing.

7-12-11