In the
United States Court of Appeals
For the Seventh Circuit

Nos. 97-4027, 98-1226, 98-1917, 98-2941, 98-2942

United States of America,

Plaintiff-Appellee,

v.

Jack M. Lee,

Defendant-Appellant,

and

Margaret B. Lee,

Claimant-Appellant.

Appeals from the United States District Court
for the Central District of Illinois.
No. 93-CR-10075--Michael M. Mihm, Judge.

Argued April 19, 2000--Decided November 7, 2000

Before Harlington Wood, Jr., Kanne, and Diane P. Wood,
Circuit Judges.

Diane P. Wood, Circuit Judge.  Jack Lee defrauded
various individuals and institutions through a
variety of schemes. He eventually pleaded guilty
to committing numerous federal criminal offenses:
mail fraud, 18 U.S.C. sec. 1341, bank fraud, 18
U.S.C. sec. 1344, money laundering, 18 U.S.C.
sec. 1957(a), wire fraud, 18 U.S.C. sec. 1343,
and perjury, 18 U.S.C. sec. 1621. He reserved the
right to appeal the money laundering conviction,
which he has now done. Margaret Lee, Jack Lee's
wife, was pulled into the fray when the
government executed a forfeiture judgment against
Jack, under 18 U.S.C. sec. 982, by taking the
home that the Lees owned as tenants by the
entirety. (For clarity, we refer to the two
appellants by their first names for the remainder
of this opinion.) The district court denied
Margaret's petition to dismiss the forfeiture
proceedings, and that decision forms the basis
for her appeal. We find no merit in Jack's
arguments, and so we affirm his conviction, but
we agree with Margaret that it was error to
forfeit the home, and we therefore reverse that

part of the judgment.

I

We begin with Jack's fraudulent activity. While there was a great deal of it, for the purposes of this appeal we need only discuss the basis of the money laundering charge. That charge stemmed from his procurement of a $280,000 loan from Amcore Bank on behalf of one of the companies he had formed, Capital Communications, Inc. (CCI).

In February 1990, Jack approached Amcore Bank in search of loans for CCI. CCI was a corporation wholly owned by Jack's two daughters, Margaret and Debbie; Jack served as its president. To support his application, Jack gave Amcore a personal financial statement. Unfortunately for everyone, including Jack by now, that statement was false: it substantially overstated his assets, and it omitted important details such as liabilities of over three million dollars.

Relying on this information, on April 6, 1990, Amcore approved a $280,000 loan. The bank issued a note, signed by both parties, which explained that CCI was the borrower of $280,000, and that it was liable for the repayment of the money plus interest. Both parties also signed a document labeled "Closing Statement Disbursement," which described the form in which CCI would receive its money: $192,034.38 to First of America Bank in Peoria as the payoff of CCI's building mortgage; $41,728.76 to Amcore Bank itself to pay off Note 89324 from Equity Investors representing a loan for which Equity Investors (another of Jack's companies) was responsible; $686.25 to the Chicago Title Company; $600 to Richard McCoy, Jack's attorney; $49 to the Peoria County Recorder; and $44,901.61 directly to CCI.

After the bank note and the Closing Statement had been signed, Amcore made out several bank checks in the amounts and to the recipients specified in the Closing Statement. Of particular importance here, Amcore issued a $41,728.76 check to Amcore Bank, with a note on the face of the check that it was to be used to pay off Note 89324 from Equity Investors. Then, without going through the formality of handing the check to Jack so that he could tender it back, Amcore took the check and deposited it in the Equity Investors account.

Jack was indicted on December 1, 1993, on various counts involving several different fraudulent schemes, including the Amcore loan procured under false pretenses. Count 22 of the indictment charged that by having Amcore use $41,728.76 of the fraudulent loan to pay off

Equity Investors' debt, Jack had engaged in money laundering in violation of 18 U.S.C. sec. 1957(a). Jack pleaded guilty to the list of charges reviewed above, which included Count 22. His plea reserved the right to appeal the district court's denial of his motion to dismiss Count 22. After a sentencing hearing, on November 21, 1997, Jack was sentenced to 78 months of imprisonment followed by five years of supervised release and was ordered to pay restitution in the amount of $1,587,321.50, and to forfeit $337,000 to the United States.

II

Before this court, Jack argues that the Amcore/Equity Investors transaction did not violate 18 U.S.C. sec. 1957(a). That statute states that a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity" is guilty of money laundering. In Jack's view, the charged conduct could not properly be characterized as money laundering because there was only one fraudulent transaction: he defrauded Amcore of the money, and part of that fraud was requiring the bank to give the money to Equity Investors, rather than directly to him. Therefore, he reasons, the money may have been "criminally derived," but he never "engage[d] in a monetary transaction" with it. The government parses the transaction differently and unsurprisingly concludes that the requirements of section 1957(a) were met: Jack "criminally derived" the $41,728.76 by falsely representing his financial status in order to get the loan, and he then "engage[d] in a monetary transaction" with that money by using it to pay off the Equity Investors debt.

For a section 1957(a) conviction to be proper, "criminally derived property" must first have existed, and then at a later time, the charged party must have attempted to bring about or have actually brought about a transaction with it. See United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998) ("[T]he predicate offenses must produce proceeds before anyone can launder those proceeds."). Here, the money was not criminally derived until Jack committed bank fraud by defrauding Amcore, a financial institution, or by "obtain[ing] any . . . property owned by, or under the custody or control of [Amcore], by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. sec. 1344.

Jack's bank fraud was complete, and the loan money therefore "criminally derived," when he and

Amcore signed the bank note and transferred control of the money to Jack. See United States v. Gregg, 179 F.3d 1312, 1316 (11th Cir. 1999) (finding bank fraud complete when bank made funds available for defendant's use). No one doubts here that the initial monetary transaction from Amcore to Jack was completed, and that fact distinguishes this case from United States v. Piervinanzi, 23 F.3d 670 (2d Cir. 1994), to which both parties refer. In that case, an attempted wire transfer was not completed, and therefore no money was actually laundered. We therefore find Piervinanzi to be of no particular assistance here. The parties' focus on who physically touched the bank check used to pay off Equity Investors' debt and when the person did so is similarly unhelpful. We live in an age where money can be and often is transferred between owners with a few strokes on a computer's keyboard. The physical transferring of dollar bills may not be quite as obsolete as the medieval English practice of feoffment with livery of seisin, under which land was conveyed with the symbolic handing over of a clod of dirt, but it may be getting there.

After the signing of the bank note, Amcore acted under Jack's direction, as it was bound to do under the signed Closing Statement. In effect, therefore, it was Jack who "engage[d] in a monetary transaction" with the bank when Amcore deposited a check into the Equity Investors account. Those funds belonged to Jack in his capacity as president of CCI, and Jack was responsible for the transfer. Amcore was not using its own money to help Equity Investors. It had already loaned the money to Jack, and was simply following his instructions as to how to disburse it. Amcore's role in transferring Jack's money does not let Jack off the hook, and we conclude that he cannot escape a money laundering conviction by using an agent to launder the money for him.

III

Margaret's appeal relates to that part of Jack's sentence requiring forfeiture of $337,000 to the United States. The government, in an attempt to recover that sum of money, moved to substitute Jack and Margaret Lee's family home in Florida, which had not been connected to any criminal activity, for the forfeiture amount. That fact, among others, distinguishes this case from Bennis v. Michigan, 516 U.S. 442 (1996), in which the Supreme Court held that a Michigan forfeiture statute with no innocent owner defense was not unconstitutional. It also distinguishes this case from the Eleventh Circuit's decision in United States v. Kennedy, 201 F.3d 1324 (11th

Cir. 2000), on which the government also relies, because the jury in Kennedy found that the property was involved in the unlawful transaction or was traceable to property that was so involved. Id. at 1326. Kennedy also turned on the question whether the innocent spouse ever purchased her husband's interest in the property, id. at 1329-31, which is not at issue here.

Margaret petitioned to dismiss the forfeiture proceedings, claiming that Jack had no forfeitable property interest in the house because it was owned by the couple as tenants by the entirety. On July 22, 1998 the district court dismissed Margaret's petition. It ruled that the government would, in effect, be substituted for Jack in the ownership of the home--in other words, the government would become Margaret's co-tenant by the entirety. Margaret would thus retain use of the property during her lifetime. She would also retain her right of survivorship: if she survived Jack she would own the property in fee simple, but if she died before Jack the government would attain ownership of a fee simple.

We look to state property law to determine whether Jack's interest in the Lee home was a property interest subject to forfeiture. See United States v. Ben-Hur, 20 F.3d 313, 317 (7th Cir. 1994). Margaret and Jack Lee held their Florida home in a tenancy by the entirety, a form of title under which a husband and wife may jointly own an estate in Florida. See Sitomer v. Orlan, 660 So.2d 1111, 1113 (Fla. Dist. Ct. App. 1995). Such a tenancy must possess five unities in order to survive: there must be joint ownership and control; each tenant must have an equal interest in the property; those interests must have originated at the same time; those interests must have been derived from the same instrument; and the tenants must be married. See id. "The essential characteristic of an estate by the entirety is that each spouse is seized of the whole or the entirety, and not of a share, moiety, or divisible part. Upon the death of one spouse, the other does not 'inherit' the interest of the other in such estate, but merely comes into the full beneficial enjoyment of such estate, which is said to vest by operation of law in the surviving spouse." Ashwood v. Patterson, 49 So.2d 848, 849 (Fla. 1951) (en banc) (internal citations omitted).

The two tenants, then, in a valid tenancy by the entirety, are bound to make decisions regarding the property together. Tenancies by the entirety in Florida operate under these rules to protect the rights of each spouse-- against one another, and against creditors. "Neither spouse

may sever or forfeit any part of the estate without the assent of the other, so as to defeat the right of the survivor." Sitomer, 660 So.2d at 1113. "Property owned as a tenancy by the entiret[y] cannot be made available to answer for the judgment debts of one of the tenants individually." Neu v. Andrews, 528 So.2d 1278, 1279 (Fla. Dist. Ct. App. 1988).

Florida law clearly prohibits the forfeiture of Jack's interest in the family home without Margaret's consent. See Havoco of Am., Ltd. v. Hill, 197 F.3d 1135, 1139 (11th Cir. 1999) (finding that a tenant by the entirety does not possess a forfeitable interest in property); United States v. One Single Family Residence With Out Buildings, 894 F.2d 1511, 1515-16 (11th Cir. 1990) (same). Margaret's security as against her husband's creditors, such as the federal government here, is exactly what the law of tenancy by the entirety protects.

The district court came to the opposite conclusion by relying on the Third Circuit's decision in United States v. Parcel of Real Property Known as 1500 Lincoln Avenue, 949 F.2d 73 (3d Cir. 1991). It found that the federal government has a special interest in criminal forfeiture, and that the "innocent spouse's" interest in such an estate might be preserved by giving that spouse the use and possession of the property during her life, as well as a survivorship right should her husband predecease her. See id. at 77-78. But the Third Circuit was faced with a substantially different problem from the one now before us. In 1500 Lincoln Avenue, the contested property once again had been used for the illegal activities (there, the illegal diversion of various pharmaceutical drugs). The court concluded that it had to come to an accommodation between two parts of the statutory mandate of 21 U.S.C. sec. 881(a)(7): on the one hand, the government's right to obtain forfeiture of property used to commit or facilitate the drug offense, and on the other, protection of the rights of innocent owners. See 1500 Lincoln Avenue, 949 F.2d at 77. The federal law mandate would have been compromised if the court had given full force to Pennsylvania's rules about tenancies by the entirety. Faced with that dilemma, the court adopted the middle ground that the government urges here as well, namely, forfeiture of the husband's interest in the tenancy by the entirety and recognition of the wife's right to full and exclusive use of the property during her lifetime, protection against any alienation without her consent, and the right to obtain title in fee simple if the husband predeceased her.

Our context is significantly different, because the only claim the government has to the Lee house arises because the house could be treated as a substitute asset, pursuant to 18 U.S.C. sec. 982(b)(2) and 21 U.S.C. sec. 853(p). In such a case, the need to strike a balance between the government's interest in seizing the means for committing a crime and the innocent spouse's rights must be assessed differently. In our view, there is no warrant for ignoring the nature of the property right created by the state law--here, the Florida law of tenancy by the entirety--in a substitute asset case. (We thus have no need to consider whether we would agree with the Third Circuit's approach in a case involving property used to commit an offense or property that can be traced to it.)

Without the compelling need to seize unlawfully used property (or its derivatives), the interests of the innocent party become far more important. And from that perspective, it is plain that the Third Circuit's compromise substantially diminishes the innocent spouse's rights. In the hybrid arrangement that was approved in 1500 Lincoln Avenue, Margaret would, as a practical matter, lose her right to control and manage the estate. The government would be Margaret Lee's co-tenant in a form of property ownership which requires both parties to participate in nearly every decision concerning the property. No mortgage would be possible without the signature of both tenants (since otherwise creditors would risk losing their entire investment at the death of one of the Lees). Margaret would need the government's approval to sell the property or to transfer the estate into a tenancy in common. Though she would be fully liable for taxes and other costs of homeownership in any tenancy by the entirety, in a normal tenancy by the entirety there would be a chance that her husband, also fully liable for the property, would contribute to those expenses. Because the government (as it admitted at oral argument) would not be there with its checkbook, she could do little more than sit by and hope that the estate would not fall into disrepair. We therefore conclude that the attributes of tenancy by the entirety recognized by Florida law here should not have been overridden by the district court, and the house should have been considered unavailable for a substitute asset order. (We note, should it become relevant in the future, that if the tenancy by the entirety is ever split in accordance with Florida law, Jack and Margaret's interests would then become distinct and separable so that a later forfeiture of Jack's interest in the property would not affect Margaret's rights. See One Single Family Residence, 894 F.2d at 1516, n.6.)

IV

   We Affirm Jack Lee's money laundering conviction and Reverse the district court's rejection of Margaret Lee's petition to dismiss the forfeiture.