# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 16, 2024       Decided June 13, 2025

No. 24-3005

UNITED STATES OF AMERICA,
APPELLANT

v.

ROBERTO ADAMS,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00625-1)

*Mark Hobel*, Assistant U.S. Attorney, argued the cause for appellant. With him on the briefs were *Matthew M. Graves*, U.S. Attorney at the time the briefs were filed, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant U.S. Attorneys.

*A. J. Kramer*, Federal Public Defender, argued the cause and filed the brief for appellee.

Before: MILLETT and CHILDS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

2

MILLETT, *Circuit Judge*: Roberto Adams was convicted of one count of wire fraud and one count of money laundering in connection with the misuse of a small-business loan he received from the government under the Coronavirus Aid, Relief, and Economic Security Act's Paycheck Protection Program. Because Adams did not testify at trial, his counsel requested that the court instruct the jury not to draw any adverse inference from Adams' decision not to testify. The district court agreed to give such an instruction, but then inadvertently omitted it when instructing the jury. Adams' counsel failed to object until roughly 30 minutes after the jury's verdict, at which point counsel also moved for a new trial. The district court granted Adams' motion for a new trial, and the government appealed. We affirm.

**I**

**A**

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act to help address the severe economic consequences caused by the pandemic. Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020) (codified at 15 U.S.C. § 636). One component of the Act was the Paycheck Protection Program ("Paycheck Program"). *See* 15 U.S.C. § 636(a)(36). The Paycheck Program provided loans administered by the Small Business Administration that were "intended to provide economic relief to small businesses nationwide adversely impacted" by the pandemic. Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,811 (April 15, 2020) (to be codified at 13 C.F.R. parts 120 & 121). To be eligible for a Paycheck Program loan, a business had to (i) have been "in operation on February 15, 2020," and (ii) either have "employees for whom [it] paid salaries and payroll taxes or paid independent contractors," or be "an

individual who operate[d] under a sole proprietorship or as an independent contractor or eligible self-employed individual[.]" *Id.* at 20,812. The loans were guaranteed by the Small Business Administration, and applicants could later apply for loan forgiveness. 15 U.S.C. §§ 636(a)(2)(F), 636m(b).

Applicants could apply for a loan by submitting an online application form directly to an authorized lender or a lender service provider, which would process the loan application on behalf of the Administration. 15 U.S.C. § 636(a)(36)(F)(ii)(I); Paycheck Protection Program, 85 Fed. Reg. at 20,814. Bluevine was one such lender service provider. *See generally COVID-19 SBA PPP Loan Forgiveness 101*, BLUEVINE, https://www.bluevine.com/blog/covid-sba-ppp-loan-forgiveness-101 (last visited June 3, 2025).

The loan application process relied heavily on self-certifications by the applicants to determine eligibility. The applicant had to certify, among other things, (i) "that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient," and (ii) "that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments[.]" 15 U.S.C. § 636(a)(36)(G)(i)(I)–(II); Paycheck Protection Program, 85 Fed. Reg. at 20,814. The applicant also had to certify that (i) the applicant's business "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors"; (ii) the information in the application and all supporting documents was "true and accurate in all material respects"; (iii) the applicant "underst[ood] that knowingly making a false statement to obtain a guaranteed loan from [the Small Business Administration] is punishable under the law"; and (iv) the tax documents submitted to support the application were "identical

to those submitted to the Internal Revenue Service." Paycheck Protection Program, 85 Fed. Reg. at 20,814–20,815.

An applicant could obtain up to two loans under the Paycheck Program. 15 U.S.C. § 636(a)(37). To obtain the second loan, an applicant had to certify that it had used the full amount of the first Paycheck Program loan "only for eligible expenses." Paycheck Protection Program Second Draw Loans, 86 Fed. Reg. 3,712, 3,721 (Jan. 14, 2021) (to be codified at 13 C.F.R. parts 120 & 121). The applicant also had to certify that it had suffered more than a 25% reduction in gross receipts for its business as compared to the same time period in 2019 (that is, prior to the pandemic). *Id.*

**B**

In June 2020, Roberto Adams was a police officer with the District of Columbia Metropolitan Police Department. After the pandemic started, Adams incorporated a cleaning business named SuperKlean LLC. The evidence at trial showed that SuperKlean had no employee expenses or income between December 22, 2018, and February 2, 2021. *See* App. 678–679.

Jacoby Taylor was a police officer and Adams' partner, as well as his close friend. Taylor knew that Adams was starting a business and connected Adams to Gerrika Bunche, a businesswoman based in North Carolina. Bunche had created a business obtaining Paycheck Program loans in exchange for commissions.

On July 31, 2020, while Adams was working with Taylor, Bunche sent Adams an email soliciting his business. Bunche's email contained a section on "main points" about the Paycheck Program that omitted important information regarding loan eligibility, including that an applicant's business had to have

been in existence prior to February 15, 2020, and to have payroll expenses. App. 812-813. Bunche also did not explain the permitted uses for the loan money.

In her email, Bunche requested that Adams provide personally identifying information, such as his social security number, date of birth, email address, and bank account information. Bunche then created a Bluevine account on Adams' behalf and completed and signed all the Paycheck Program loan application documents using Adams' name. In the applications, Bunche identified Adams as self-employed with an average monthly business payroll of $7,338, and she requested a loan of $18,345. She also used Adams' initials to make all the requisite certifications, including that (i) SuperKlean was in operation on February 15, 2020; (ii) the company had employees for whom it paid salaries and payroll taxes; (iii) the loan would be used to retain workers and maintain payroll or make other specified payments; and (iv) Adams understood that if the funds were knowingly used for unauthorized purposes, he could be held liable. Finally, Bunche created a Schedule C Form 1040 IRS document representing that SuperKlean had a gross income of $94,520 and expenditures of $865 on advertising, $14,075 on Adams' car, and $4,120 on supplies.

The record does not reveal how Bunche obtained the name and purpose of Adams' business or the financial figures she used in completing Adams' application. There is also no record evidence that Adams reviewed or approved the final application prior to Bunche submitting it to the government.

After Bunche filed the application, Bluevine emailed Adams a PDF copy of his completed application. There is no evidence in the record that Adams ever downloaded or read the loan documents after they were submitted.

Adams' application was approved on July 31, 2020, and Adams received the $18,345 loan in his bank account four days later. By September 2020, Adams had spent the entirety of the loan on gambling, personal travel, dining, a car loan payment, and a residential apartment deposit. A government investigation concluded that none of the expenses were business related.

On December 30, 2020, Adams texted Bunche asking whether she could complete a second Paycheck Program loan application on his behalf. Bunche responded that she could. Adams responded, "Lol let's do it[.]" App. 321.

On January 21, 2021, Bunche submitted Adams' second application. Again, there is no record evidence that Adams reviewed or approved the final application prior to Bunche submitting it to the government. Bunche initialed Adams' name to make the same certifications as in the first application. Bunche also certified that Adams spent the proceeds from the first loan only on permitted expenses. As with the first application, Bluevine emailed Adams a PDF copy of his completed application, but there again is no evidence that Adams ever downloaded or reviewed the loan documents. Adams received the second loan of $18,345 on January 29, 2021. He spent the entirety of the loan in four days on personal expenses, including a single transaction of $12,110.91 for rent and rental arrears.

In April 2021, Adams applied for a position at the Seattle Police Department. As part of his background check, the Seattle Police Department discovered that Adams had received two Paycheck Program loans. The Department requested that Adams provide the "name and type of business" for which he was able to obtain the loans and the "purpose for the funds."

App. 301–302. Adams responded that he had a janitorial cleaning business named SuperKlean. He also explained that "[t]he amount of the loan was $18,345," and that "[t]he purpose of the loan was to provide relief and assistance for [his] small business during the pandemic." *Id.*

On July 28, 2021, and August 4, 2021, Adams forwarded Bunche two emails about loan forgiveness for the first Paycheck Program loan. Bunche subsequently completed the loan forgiveness application on Adams' behalf, and Adams' loan was forgiven. On August 9, 2021, Adams texted Bunche asking if she could complete a loan forgiveness application for the second loan. That same month, Adams was arrested. It is not clear whether Bunche ever submitted a second application for loan forgiveness on Adams' behalf, but Adams' second loan was never forgiven.

## C

A grand jury indicted Adams on two counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of expenditure money laundering, in violation of 18 U.S.C. § 1957(a).[1] The two wire fraud counts corresponded to each of the two Paycheck Program loans that Adams received. The expenditure money laundering count alleged that Adams used $12,110.91 of the second loan for personal rental expenses.

---

[1] "Expenditure money laundering" occurs when a person "knowingly engages or attempts to engage in a monetary transaction" using property derived from a crime and (i) that property has a value of more than $10,000, and (ii) the criminal activity from which the property was derived appears on a statutory list of qualifying crimes (such as the wire fraud at issue here). 18 U.S.C. § 1957(a); *see id*. § 1956(c)(7) (listing the specified crimes); *see also, e.g.*, *United States v. Lee*, 232 F.3d 556, 559 (7th Cir. 2000).

Before trial, the parties submitted a joint pretrial statement containing proposed jury instructions. At that time, Adams had not yet decided whether he would testify at trial. Accordingly, the joint pretrial statement specified that, depending on Adams' decision, the instructions should include either an instruction on the defendant as a witness, or an instruction that the jury should draw no adverse inference from the defendant's decision not to testify.

During trial, the district court provided the parties with a first draft of the jury instructions, which included the two alternative instructions concerning Adams' testimonial choice. Then, four days into trial, Adams' counsel notified the district court that Adams had elected not to testify at trial. Later that day, the court circulated an updated draft of the jury instructions that inadvertently omitted the instruction that the jury should draw no adverse inference from the defendant's decision not to testify. That same day, the court circulated a further updated draft of the instructions and then proposed final jury instructions, both of which continued to omit the no-adverse-inference instruction. Neither Adams' counsel nor the prosecution alerted the district court to the absence of the no-adverse-inference instruction that they had jointly requested or objected to its omission.

On the afternoon of the last day of trial, the district court asked counsel whether they had any corrections to the final draft of the jury instructions. Both Adams and the government said that they had no objections. The court then instructed the jury. Neither defense counsel nor the government objected to the absence of a no-adverse-inference instruction at any point.

The following day, the jury returned a split verdict acquitting Adams of the wire fraud charge corresponding to the first Paycheck Program loan, but convicting him of wire fraud

as to the second loan and expenditure money laundering for the use of its funds for personal rental expenses. About thirty minutes after the court adjourned, defense counsel asked the court whether the jury instructions had included the no-adverse-inference instruction. The court responded that they had not. Defense counsel responded within two minutes stating that Adams would be filing a motion for a new trial.

During a status conference on August 28, 2023, defense counsel moved orally for a mistrial. A month later, Adams filed a written motion for a new trial under Federal Rule of Criminal Procedure 33 based on the omission of the no-adverse-inference instruction. The district court then appointed conflicts counsel, who filed a supplemental Rule 33 motion alleging ineffective assistance of counsel based on trial counsel's failure to timely object to the omission. The government opposed both motions.

The district court granted Adams' motion for a new trial. The court concluded that Adams had shown plain error in the court's omission of the requested and promised no-adverse-inference instruction. The court also found that the error was prejudicial and that a new trial was in the interests of justice. In assessing whether there was a reasonable probability that the error affected the outcome of the case, the court emphasized that the government's case was "not overwhelming[.]" App. 365. The government failed to present any direct evidence as to the "key disputed issue"—Adams' knowledge and intent—and relied on the jury drawing inferences from circumstantial evidence. App. 358; *see United States v. Tann*, 532 F.3d 868, 872 (D.C. Cir. 2008) ("To prove wire fraud, the Government must show: (1) the defendant 'knowingly and willingly entered into a scheme to defraud'; and (2) 'an interstate wire communication was used to further the scheme.'") (quoting

*United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006)).

The district court also observed that when, as here, the defendant is charged with multiple counts of the same type of conduct, the split verdict shows that the jury likely viewed each count as a close call. App. 365. Under these circumstances, the district court concluded "[i]t is reasonably probable" that Adams' decision not to testify, coupled with the court's omission of the no-adverse-inference instruction, "had the effect of strengthening the government's circumstantial evidence, thereby contributing to his conviction on Counts 2 and 3." App. 365–366. The court added that "there is a reasonable probability" that if the court had given the no-adverse-inference instruction, "the jury would have been less willing to take the inferential leaps required to convict, and would have acquitted the defendant on those counts." App. 366. For those reasons, the court exercised its discretion to grant Adams' Rule 33 motion. App. 368.

## II

The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 18 U.S.C. § 3731.

## III

The district court's grant of a new trial in this case was consistent with the law and reflected a reasonable exercise of its discretion.

### A

This case implicates three rules governing criminal trials.

11

Federal Rule of Criminal Procedure 33 governs a defendant's motion for a new trial. That Rule provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). We generally review the trial court's grant of a new trial under Rule 33 for abuse of discretion. *See United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008); *United States v. Hall*, 324 F.3d 720, 722 (D.C. Cir. 2003). But we review any question of law embedded in the district court's analysis *de novo*. *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) (citing *Hall*, 324 F.3d at 722).

At the same time, Federal Rule of Criminal Procedure 30 provides that "[a] party who objects to any portion of the [jury] instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." FED. R. CRIM. P. 30(d). Failure to object precludes appellate review of the belatedly asserted error unless the party demonstrates plain error under Rule 52(b). *Id.*

Rule 52(b), in turn, provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." FED. R. CRIM. P. 52(b). So "[w]hen no objection is made" to a jury instruction "before the jury retires, an instruction is reviewed only for 'plain error affecting a substantial right so that a miscarriage of justice would otherwise result.'" *United States v. Dale*, 991 F.2d 819, 850–851 (D.C. Cir. 1993) (quoting *United States v. Lancaster*, 968 F.2d 1250, 1254 (D.C. Cir. 1992)). This includes when the district court "inadvertently omit[s]" an instruction "that the parties had agreed to include" and the parties do not timely object to the district court's omission. *United States v. Bostick*, 791 F.3d 127, 144 (D.C. Cir. 2015).

In short, plain error will be found when (i) the district court committed an error; (ii) the error was "plain—that is to say, clear or obvious"; (iii) the error affected the party's "substantial rights" in that there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different"; and (iv) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 134–135 (2018) (internal citations and quotation marks omitted).

In this case, the district court itself found that it had committed plain error and that the interests of justice warranted the grant of a new trial. The government argues that the court erred in its application of plain-error analysis and in then ordering a new trial under Rule 33. Gov't Reply Br. 1, 13–14.

This court has not yet decided whether plain error analysis applies to the decision to grant a new trial under Rule 33, and we need not resolve that question today. Whether or not the district court was *required* to apply Rule 52's plain-error standard in deciding whether to grant a new trial under Rule 33, the district court in this case *chose* to apply the plain-error standard. And its decision merits affirmance even under that most exacting standard of review.

**B**

The district court appropriately concluded that the failure to provide the requested no-adverse-inference instruction qualified as a plain error that warranted the grant of a new trial.

**1**

The government does not dispute that Adams satisfies the first two prongs of plain-error review. Gov't Opening Br. 37

n.4. Nor could it. Failure to give the no-adverse-inference instruction was plain legal error. In *Carter v. Kentucky*, 450 U.S. 288 (1981), the Supreme Court held that a trial judge "must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so[,]" *id.* at 300. *See also James v. Kentucky*, 466 U.S. 341, 342 (1984) (same); *United States v. Brand*, 80 F.3d 560, 567 (1st Cir. 1996) (finding that omission was a plain error that affected substantial rights under the first three prongs of plain-error review). Here, Adams and the government jointly requested that the district court provide a no-adverse-inference instruction to the jury, and the court agreed that the instruction was warranted. Accordingly, the court's inadvertent omission of the instruction was both clear and obvious error.

The government argues, however, that the district court's omission of the instruction does not satisfy the third or fourth prongs of plain-error analysis. As to those questions, the parties disagree as to whether our review should be *de novo* or for abuse of discretion. *Compare* Gov't Opening Br. 41–42, *with* Adams Br. 48. We need not resolve that dispute because, even under *de novo* review, the district court properly concluded that both prongs were satisfied.

**2**

Under the third prong, the error must have affected the defendant's "substantial rights[.]" *United States v. Olano*, 507 U.S. 725, 734 (1993) (quoting FED. R. CRIM. P. 52(b)). That occurs when there is "'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Greer v. United States*, 593 U.S. 503, 507–508 (2021) (quoting *Rosales-Mireles*, 585 U.S. at 134–135). To establish that the omitted jury instruction affected Adams' substantial rights, the court had to find that "individual

14

prejudice" resulted. *United States v. Marcus*, 560 U.S. 258, 265 (2010). The district court made that finding and we affirm.

**a**

As the district court explained, and the government does not contest, the "key disputed issue" at trial was whether Adams "knew and intended" for Bunche to submit on his behalf Paycheck Program loan applications that contained false information. App. 358. As to that issue, the government relied "entirely on circumstantial evidence" and inferences therefrom to establish Adams' knowledge and intent. App. 365. Consequently, the government's case depended critically on the jury taking a series of inferential steps in an evidentiarily close case. That left the jury's decisionmaking process primed to adding another inference about why Adams did not testify, and it strengthened the force of the government's circumstantial evidence. For those reasons and on this record, there is a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

We start by reviewing the evidence presented at trial. The government did not have any direct evidence that Adams provided Bunche with the *false* information that she used to complete his first or second loan applications. There was evidence that Adams supplied Bunche with some of the information needed to fill out the applications. Adams provided Bunche with his name, social security number, date of birth, address, telephone number, email address, citizenship status, and bank account information. App. 811–812, 819–820. But none of that information was untrue.

There are no emails or text messages showing that Adams provided Bunche additional information, and the phone records reflect that Adams and Bunche did not even have their first

15

phone call until after Bunche submitted the first application, which already included the false average monthly payroll figure and other false information required to obtain a loan. App. 1098.[2]

As a result, to find that Adams knowingly and intentionally falsified the all-important facts that Bunche reported—that is, that SuperKlean had an average monthly payroll of $7,338, a gross income of $94,520, and expenditures of $865 on advertising, $14,075 on Adams' car, and $4,120 on supplies—the jury had to rely on circumstantial evidence and inferences from it. App. 988–989. Likewise, there is no evidence that Adams provided Bunche the information she needed to make the certifications on both applications. In particular, there is no evidence of Adams telling Bunche that (i) SuperKlean was in operation on February 15, 2020, (ii) SuperKlean had employees for whom it paid salaries and payroll taxes, or (iii) the uncertainty of pandemic economic conditions made the loan necessary to support SuperKlean's ongoing operations.

Trying to address that evidentiary gap, the government asserted at trial that Adams and Bunche "likely had other

---

[2] None of this is to suggest that direct evidence is necessarily more probative than circumstantial evidence. 1 *McCormick on Evidence* § 185.3 (Robert P. Mosteller, et al. eds., 9th ed. 2020); *cf. Holland v. United States*, 348 U.S. 121, 139–140 (1954) (rejecting the need for an instruction "that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt" because "[c]ircumstantial evidence in this respect is intrinsically no different from testimonial evidence"). The point is only that the government's heavily circumstantial case left more pieces for the jury to fit together with inferential glue, which made the risk of an additional inference about Adams' silence more appreciable in such a close case.

conversations" for which the government lacked evidence. App. 1566. The government pointed out that Bunche had the correct name of Adams' business, "SuperKlean," and its claimed purpose of providing janitorial services. The government reasoned that Bunche "would have had no other way" to know this information other than from Adams himself. App. 1566. And the government argued that "FaceTime was one way" Adams "could have conveyed this additional personal information" to Bunche, records of which the government had not been able to capture. App. 1567.

To buy the government's theory of the case, the jury would have had first to infer that Adams and Bunche exchanged Facetime calls despite the absence of any evidentiary record of them. App. 804–805. Then the jury would have to infer that, in providing Bunche truthful information, Adams also provided false information at the same time. In addition, the jury would have to reject Adams' arguments that Taylor, who had a longstanding relationship with Bunche and knew of Adams' business, provided the name and purpose of Adams' business to Bunche. Or that Bunche herself fabricated the false numbers. These alternatives are not so far-fetched. One of those alternatives seemingly led the jury to acquit Adams of fraud relating to his first loan application, which included the exact same false information.

The evidentiary gaps in the government's case did not stop there. There was no evidence that Adams reviewed the false information or false certifications contained in either the first or second loan application that Bunche composed. While Adams received the completed loan documents as PDF email attachments from Bluevine, the FBI did not find downloaded copies of the loan application documents on any of the electronic devices seized from Adams, and the FBI had no

evidence that Adams had viewed any of the documents in his email. App. 1138–1139, 1145.

The government also failed to present evidence that Adams was aware of the Paycheck Program's requirements, such as the need to have an ongoing business with actual employees who would benefit from the payments. In her emails to Adams, Bunche never advised Adams of the criteria for obtaining a loan, App. 1148–1150, and there is no evidence that Adams ever visited the loan application website himself, App. 1104.

The government points out that Adams affirmatively reached out to Bunche to submit his second application. App. 897. True. But nothing in their exchanges speaks to Adams' knowledge of the legal preconditions for obtaining that second loan or indicates Adams' intent that Bunche submit fraudulent information to the government on his behalf. The jury would have had to make those inferences.

To be sure, the government showed that Adams told the Seattle Police Department "the purpose of the loan was to provide relief and assistance for [his] small business during the pandemic[,]" reflecting that Adams understood at least that portion of the purpose of the Paycheck Program loan. App. 301. But there is no dispute that Adams had a small business during the pandemic; it just was not up and running. Anyhow, Adams made that statement more than four months after Bunche submitted the second loan application. App. 301. So the jury would still have had to infer that Adams *at the time the applications were submitted* understood the terms and purpose of the Paycheck Program loan that pertain not just to having a business, but also to the age of the business, having employees, and using the funds to keep them working. The record lacked any evidence of Adams' knowledge of the aspects of the

Program as to which his applications were false. The jury had to infer all those critical facts.

In short, to establish Adams' knowledge and intent in this case, the government asked the jury to make inference after inference at every turn—something that the jury declined to do as to the fraud count for the first Paycheck Program loan. Of course, juries can and routinely do make inferences from evidence. But the circumstantial and inferential character of all of the most critical evidence in this case supports the district court's conclusion that the case against Adams "was not overwhelming." App. 365. Under all those circumstances, there is a reasonable probability that the district court's failure to instruct the jury not to draw any adverse inference from Adams' decision not to testify tipped the inferential scales against acquittal on the remaining two counts.

**b**

In addition, the district court's front-row view of the trial and evidence, as well as its informed perspective on the meaning of the split verdict, carry important weight in analyzing the prejudicial impact of an error. Even under *de novo* review, we can consider the district court's expert vantage point in reviewing the import of the evidence presented, the significance of a split verdict, and the probable effect of the jury instruction error on the outcome of the case. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A]s a general matter[,] determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by [district court] judges[.]"); *United States v. Kayode*, 254 F.3d 204, 209 (D.C. Cir. 2001) (same); *Ball v. Trusler*, 182

F.3d 913, 1999 WL 422962, at *3 (5th Cir. 1999) (unpublished) (according deference "to the trial judge, who was present and heard the evidence," on plain-error review).

Here, the district court—that had a front row seat to the trial and presentation of evidence—viewed the split verdict as "suggest[ing] that the jury viewed each of the substantive counts as a close call." *United States v. Duldulao*, 87 F.4th 1239, 1261 (11th Cir. 2023); *see* App. 365. The jury's line-drawing between the first and second Paycheck Program loans rested on a slender evidentiary record. The government's inferential evidence was essentially the same as to both loans. Although Adams and Bunche began having phone calls after the first loan application was submitted, the false information she used in the second loan was the same as in the first. Like the first application, there was no evidence that Adams reviewed or approved of the information in the second application. The only differences were that Adams had already received a completed copy of his first Paycheck Program loan application, albeit with no evidence Adams had looked at it, Adams had already spent the proceeds of the first loan on personal expenses, and Adams asked Bunche to submit the second application.

Even then, the government's case hinged on the jury inferring from the evidence that Adams had the requisite knowledge about the limitations on how the funds could be spent and intent to defraud the Program. That all suggests that the line between conviction and acquittal turned on thin inferences, the type of evidence for which a defendant's unexplained silence might well have made a difference. As the district court observed, the jury may have wanted to hear from Adams about how he did not know he was committing fraud by the time of the second application, after he had received the completed documents from the first application and spent the

proceeds on personal expenses. The jury may have also wanted to hear from Adams about why he told the Seattle Police Department that the purpose of the loans was for his small business. In deciding Adams' guilt on the second fraud count and the money laundering count, the jury could have held against Adams his decision not to provide these answers.

The government argues that we should view the split verdict as "refut[ing] any inference that the jury gave undue weight to matters that were not in evidence" such as Adams' decision not to testify. Gov't Opening Br. 46 (quoting *United States v. Small*, 74 F.3d 1276, 1284 (D.C. Cir. 1996)). Under the facts of this case, the split verdict gave no such indication. In *Small*, the split verdict indicated that a prosecutor's prejudicial statements did not infect the defendant's conviction because the defendant was acquitted of the charge for which the prosecutor's statements might have been key to linking the defendant to the crime, but then convicted of a charge for which there was "independent overwhelming evidence." *Small*, 74 F.3d at 1284.

By contrast, in this case, (i) all counts largely relied on the same evidence, (ii) the evidence was close, not "overwhelming," on all counts, and (iii) the matter "not in evidence"—Adams' decision not to testify—was relevant to all counts. *Small*, 74 F.3d at 1284. Under those circumstances, we take due account of the district court's judgment that the split verdict confirmed the closeness of the case, in which any change in the evidentiary balance (such as an inference about testimonial silence) mattered.

The Supreme Court has said that "a defendant must pay *no* court-imposed price for the exercise of his constitutional privilege not to testify." *Carter*, 450 U.S. at 301 (emphasis added). On the record in this case, as the district court

explained, the split verdict provides no assurance that Adams' testimonial absence played *no* outcome-influencing role in the jury's deliberations.

**c**

Finally, in evaluating prejudice from an instructional error, "[w]e consider [the] jury instructions as a whole." *United States v. Hite*, 769 F.3d 1154, 1166 (D.C. Cir. 2014) (first citing *United States v. Norris*, 873 F.2d 1519, 1524–1525 (D.C. Cir. 1989); and then *United States v. Martin*, 475 F.2d 943, 947 (D.C. Cir. 1973)). In this case, the jury instructions as a whole did nothing to mitigate the absence of the no-adverse-inference instruction.

To start, no part of the instructions addressed, directly or indirectly, Adams' right not to testify or the prohibition on the jury attaching any relevance to the absence of his testimony. The government emphasizes the instruction that "[t]he law does not require a defendant to prove his innocence or to produce any evidence at all." App. 1537. But instructing the jury that Adams did not have to produce any evidence at all is of no help in this case, where Adams chose to put on a defense and the jury was left to draw inferences as to why Adams' testimony was not part of the defense's case.

Next, the government points to the district court's instruction that the jury "may consider only the evidence properly admitted in this trial," which "was the sworn testimony of the witnesses and the exhibits that were admitted into evidence." App. 1539–1540. That instruction is of little help here where the jury had to go beyond the evidence itself and to draw inferences from the evidence, and so may have been primed also to make an inference about Adams' testimonial silence.

Finally, the government argues that including the instruction could have harmed Adams by calling attention to his decision not to testify. Gov't Opening Br. 49. That tactical judgment was Adams' to make and his alone. He chose to request such an instruction. And the government seconded the request. So the question at this stage is not whether an absence of prejudice could be hypothesized, as the government posits. It is only whether the record in this case demonstrates a reasonable probability that the instruction's omission changed the outcome of the jury's deliberations. The district court's finding of prejudice is fully supported by the record and consistent with precedent.

\* \* \* \* \*

For all those reasons, the district court properly concluded on this record that the third plain-error prong was met.

**3**

Having appropriately found that the first three prongs of plain-error analysis were met, the district court still had to determine whether the error "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). That is a "case-specific and fact-intensive" inquiry that the district court concluded was met. *Puckett v. United States*, 556 U.S. 129, 142 (2009). We agree.

The district court fairly considered the evidentiary record and the circumstances of this case in deciding that its inadvertent omission of the no-adverse-inference instruction affected the fairness and integrity of the proceedings. Here (i) the parties jointly requested the instruction in their joint pretrial

statement, and defense counsel repeated the request; (ii) the district court repeatedly confirmed that it would include the instruction; (iii) the instruction was, by the district court's own admission, inadvertently omitted on the last day of trial; and (iv) the evidentiary case was close and the convictions relied heavily on inferences by the jury. Given that record, the district court appropriately concluded that the error seriously affected the fairness, integrity, and public reputation of the case.

The error is also "serious[,]" *Olano*, 507 U.S. at 736 (internal citation omitted), given that a court's failure to "give a 'no-adverse-inference' jury instruction when requested by the defendant to do so" amounts to constitutional error, *Carter*, 450 U.S. at 300. Omission of the instruction was especially unfair to Adams who had made the decision not to testify only *after* the district court had promised repeatedly to give the no-adverse-inference instruction. App. 341–342.

In addition, the district court's well-substantiated finding that omission of the instruction was prejudicial because there was a reasonable probability that it caused the adverse verdicts directly implicates the integrity and reputation of the trial. By way of comparison, in cases involving sentencing errors, the Supreme Court has suggested that a "reasonable citizen" would "bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands[.]" *Rosales-Mireles*, 585 U.S. at 141 (citation omitted). So too here.

The government urges us to weigh as a "countervailing factor[]" Adams' failure to timely object to the error despite being given ample opportunity. *See Puckett*, 556 U.S. at 143. While perhaps a relevant consideration, that factor alone does not render the district court's judgment erroneous. After all,

every plain-error analysis starts with a party's failure to object. To the extent the government is worried about gamesmanship in counsel's failure to object until after the verdict, that concern is a wash in this case where the government too failed to object to the omission of an instruction it endorsed, and that objection would have forestalled any gamesmanship. App. 42–43. Either way, the district court found that, in the context of the entire case and evidentiary record, the error affected the fairness, integrity, and public reputation of the proceeding, and both parties' oversight did not change that judgment.

\* \* \* \* \*

In sum, the district court appropriately determined that omission of the no-adverse-inference instruction amounted to plain error that was prejudicial and implicated the fairness, integrity, and public reputation of the trial. That was a sufficient basis for granting Adams a new trial on the two counts of conviction.

Adams separately argues that omission of the no-adverse-inference instruction constituted a structural error that automatically required a new trial. Adams Br. 23–39. The right not to testify undoubtedly is a gravely important right. But having already determined that the district court properly found plain error and ordered a new trial, we have no occasion to address Adams' structural-error argument. Less is better when it comes to the resolution of constitutional questions by the courts. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

25

**IV**

For the foregoing reasons, we affirm the district court's order.

*So ordered.*